MERCK & CO. INC., Merck Frosst Canada, Inc. and Johnson & Johnson * Merck Consumer Pharmaceuticals Co., Plaintiffs,

v.

Gary A. LYON and Glaxo Wellcome, Inc., Defendants.

No. 1:96CV245.

United States District Court,
M.D. North Carolina,
Durham Division.

Sept. 11, 1996.

William Sam Byassee, Jonathan A. Berkel-hammer, Shannon R. Joseph, Greensboro, NC, for plaintiffs.

John R. Wester, Julian H. Wright, Jr., Charlotte, NC, Mark A. Ash, Raleigh, NC, Thomas F. Curnin, New York City, for defendants.

## MEMORANDUM ORDER

TILLEY, District Judge.

This matter comes before the Court on plaintiffs' motion for a preliminary injunction,[1] and defendant Glaxo Wellcome, Inc.'s motion to dismiss for failure to state a claim upon which relief can be granted. For the reasons stated below, plaintiffs' motion is granted as set forth in this order, and defendant Glaxo Wellcome, Inc.'s motion to dismiss is granted in part and denied in part.

## I.

### Findings of Fact

#### A. The Parties

1. Plaintiff Merck & Co., Inc. ("Merck") is a New Jersey corporation with its principal place of business in Whitehouse Station, New Jersey.

2. Plaintiff Merck Frosst Canada Inc. ("Merck Frosst") is a Canadian corporation with its principal place of business in Ontario. Merck Frosst is a wholly owned subsidiary of Merck.

3. Plaintiff Johnson & Johnson*Merck Consumer Pharmaceuticals Co. ("J & J*Merck") is a joint venture between Johnson & Johnson Company and Merck, and is organized under the laws of the State of New Jersey. J & J*Merck was created to extend the life of prescription drugs by making them available for over-the-counter purchase by consumers shortly before the protections afforded by the patents expire. Products that were once available only by prescription, but are now or will be made available for over-the-counter purchase are often called "switch products." (Tr. I at 100–01.)

McNeil Consumer Products Company is a division of Johnson & Johnson and a part of the J & J*Merck joint venture. A majority of the personnel in the joint venture have come from McNeil, due to their OTC experience. (Tr. II at 230.)

4. Defendant Glaxo Wellcome, Inc. ("Glaxo") is a North Carolina corporation with its principal place of business in Research Triangle Park, North Carolina. Glaxo is a wholly owned subsidiary of Glaxo Wellcome, plc, located in the United Kingdom. Glaxo is also a manufacturer of pharmaceutical products and has formed a joint venture with Warner Lambert—Warner Wellcome Consumer Healthcare ("Warner Wellcome"), to market its switch products.

#### B. The Products

5. Pepcid® AC, whose active ingredient is famotidine, is the brand name for J & J*Merck's OTC version of Pepcid®. Pepcid® AC has been available in the United Kingdom since February 1994, in Sweden since early 1995, and in the United States since June 1995. (Tr. III at 407–08.) It is sold in the United States in a 10 mg tablet and is indicated for the treatment and prevention of heartburn, acid indigestion and sour stomach.

6. Zantac® 75, whose active ingredient is ranitidine, is the brand name for the OTC version of Zantac®. (Coughlin Decl. ¶ 3.) Zantac® is the number one selling prescription drug in the world, and is a two billion dollar industry in the United States. (Tr. VI at 954.) Zantac® 75 has been available to consumers in the United Kingdom since early 1995 and in the United States since April 23, 1996. (Coughlin Decl. ¶ 3.) Zantac® 75 currently outsells Pepcid® AC in the United Kingdom. (Tr. I at 152.) Zantac® 75 is currently being marketed by Warner Wellcome. (Coughlin Decl. ¶ 1.) It is sold in the United States as a 75 mg tablet and is indicated for the treatment of heartburn, acid indigestion and sour stomach. (Coughlin Decl. ¶ 3 and Ex. 1.)

---

1. Defendants have filed a motion to modify the temporary restraining order. (Docket no. 35.) The temporary restraining order, (Docket no. 8), was entered on March 15, 1996 and was to remain in effect until after a hearing on plaintiffs' motion for a preliminary injunction. The hearing concluded on April 17, 1996. As the court now addresses the preliminary injunction itself, defendant's motion to modify the temporary restraining order is moot. However, the motion and pleadings related thereto have been considered in fashioning the preliminary injunction. Furthermore, Glaxo seeks to modify the TRO to enable Lyon to recruit personnel for Glaxo Wellcome OTC operations in Europe and elsewhere, and to engage in other organizational duties. The TRO currently in place does not prohibit such activity.

7. Zantac® 75 and Pepcid® AC, along with Tagamet® HB—a SmithKline Beecham product, are competing products in a class of OTC compounds known as $H_2$ antagonists, which inhibit the production of acid in the stomach. This is in contrast to antacids, such as Mylanta®, Tums® and Rolaids®, which simply neutralize stomach acid. (Tr. I at 165–67.) Zantac®, Tagamet®, Pepcid®, along with Axid®—an Eli Lilly product, are the primary prescription drugs in the category and have been among the top fifteen selling prescription drugs in the United States. (Tr. VI at 954–55.)

### C. Gary Lyon

8. Gary Lyon ("Lyon") is a Canadian citizen. He was originally a defendant in this action but was dismissed from the case for want of personal jurisdiction. (Tr. I at 75–76.)

9. Lyon was employed by Merck from October 1990 through December 1991. In early 1992 Lyon joined Merck Frosst in Canada as the General Manager and Director of Merck Frosst Consumer Healthcare. Lyon remained with Merck Frosst through February 1996. (Lyon Dep.Ex. 18 at GW0413; Tr. VI at 873; Docket no. 37, Lyon Aff. ¶ 4.)

10. At Merck Frosst Consumer Healthcare in Canada Lyon was responsible for overseeing the personnel and the marketed products in the Canadian OTC division, establishing a long term strategic plan for the division. For Pepcid® AC, he was responsible for preparing the filing for Canadian authorities, and the pre-launch planning for Pepcid® AC. (Lyon Dep. I, at 5–6).

11. In August of 1995 Lyon accepted the position of Vice–President of Sales and Marketing for the proposed joint venture between Johnson & Johnson and Merck in Canada. (Tr. I at 102–103; Pls.Ex. 16.) The joint venture would be responsible for the successful launch and marketing of Pepcid® AC in Canada. (Lyon Dep. II at 218–19.)

12. At the time of his resignation, Lyon was responsible for developing the game plan for the Canadian launch of Pepcid® AC. It was during this period that he had contact with Merck and J & J*Merck employees in the United States regarding the United States launch of Pepcid® AC.

13. In November, 1995, an executive recruiter contacted Lyon regarding a position as Director of Global Marketing and Rest of World Commercial Operations, OTC for Glaxo Wellcome, plc.

14. The executive search was headed by Mark Weedon, General Manager of Glaxo Wellcome, plc OTC Operations. Mr. Weedon hired the executive search company and gave them Lyon's name as a potential candidate. (Weedon Dep. Apr. 2, 1996, at 42.) Mr. Weedon talked to Lyon about the position about one week after the recruiter had contacted him. (Lyon Dep.Ex. 18; Tr. I at 41.)

15. Mr. Weedon has known Lyon for several years. They worked together at Schering Plough, another pharmaceutical company. Weedon recruited Lyon to join Schering Plough. (Tr. I at 41–42; Weedon Dep. Apr. 2, 1996, at 27–28, 138.)

16. On December 15, 1995, Glaxo Wellcome officially offered Lyon the position of "Director, Global Marketing/International Commercial Operations, OTC." (Lyon Dep. Ex. 19.) On January 22, 1996, Lyon informed Curtis Selquist, Worldwide President of J & J*Merck that Lyon was considering leaving the joint venture. (Lyon Dep. III at 225.) On January 25, 1996, Lyon faxed a confirmation of his acceptance of the job offer to Glaxo Wellcome, plc. (Docket no. 37, Lyon Aff. at 13; Lyon Dep. III at 226; Weedon dep. Apr. 2, 1996, Ex. 20.)

17. Lyon's last day of employment with Merck Frosst was March 1, 1996. Lyon was to begin with Glaxo Wellcome, plc on April 1, 1996. Lyon was invited to attend Glaxo and Warner Lambert planning sessions in North Carolina in March. Arrangements for Lyon to attend the meeting were made while Lyon was still working with plaintiffs. (Weedon Dep. Apr. 29, 1996, at 132.) This meeting was held in North Carolina because 90% of Glaxo's OTC personnel are located at its United States headquarters in Research Triangle Park. (Weedon Dep. Apr. 2, 1996, at 72–73.)

18. Lyon attended the Glaxo/Warner Lambert planning sessions in Pinehurst,

North Carolina. Lyon was in North Carolina for five days in early March, 1996. (Tr. I at 42.) The meetings involved general planning sessions for the Glaxo OTC group to organize itself into a better working organization. (Tr. I at 47.)

19. At Glaxo Wellcome, plc, Lyon will oversee OTC commercial activities outside the Americas, will advise the company on $R_x$-to-OTC switches and commercialization of switch products. Lyon will also be responsible for unifying the company's global strategy. (Weedon Dep. Apr. 2, 1996, at 33–34.) Another individual, Lisa Gonzalez, will handle the Americas. Both Lyon and Gonzalez will work with Warner Lambert and Glaxo regarding both product launches and development. (Lyon Dep. I at 29–31.) Warner Lambert is the operational arm of the marketing efforts. (Lyon Dep. I at 30.)

20. Lyon will be involved in planning and discussing head-to-head advertising between Zantac® 75 and Pepcid® AC primarily to review "the potential effect that the advertising might have on the lead behind the prescription business." (Weedon Dep. May 1, 1996, at 185–86.)

21. Lyon will be involved in, although not primarily responsible for, planning and discussions for line extensions of Zantac® 75, which line extensions to pursue and when, and the advertising claims for them. His involvement will primarily be to protect the prescription business from cannibalization (an unacceptable loss of $R_x$ sales to OTC sales), and would be limited to those times "where a claim or an indication may coincide with a prescription product." (Weedon Dep. Apr. 29, 1996, at 129–31, May 1, 1996, at 186–87.)

22. Lyon will attend quarterly meetings in North Carolina. (Tr. I at 41.)

D. *Circumstances Surrounding Lyon's Termination of Employment with Merck Frosst.*

23. On January 26, 1996, one day after accepting employment with Glaxo Wellcome, plc, Lyon called Selquist to inform him that he was resigning. Selquist asked Lyon if he was going to a competitor. Lyon said he was not, and that he was considering a couple of opportunities outside of the pharmaceutical field. A few weeks later, Selquist again asked Lyon whether he would go to a competitor and Lyon gave the same response. (Tr. I at 119–21.)

24. Mr. Jean–Marie Canan, Senior Vice President of Finance and Administration for J & J*Merck worldwide, (Tr. VI at 872), also asked Lyon on two occasions, once via phone and the other in person on February 2, 1996, whether he was going to a competitor. Lyon informed Canan that he was considering two options, one as a marketing consultant in Canada and one with a pharmaceutical company in the Far East. (Tr. VI at 893–94.)

25. In his deposition, Lyon claims that any time he was asked whether he was going to a competitor he answered clearly in the affirmative that he was. (Lyon Dep. II at 98.) The Court does not find this testimony credible in the face of the testimony presented at the hearing and the subsequent conduct of plaintiffs, in allowing Lyon to continue working until March 1, 1996. (Docket no. 6, Canan Aff. ¶ 10.) Furthermore, Lyon does not dispute the fact that he did not inform plaintiffs that he had accepted any job offer when he tendered his resignation, but told them he was considering two different options. (Lyon Dep. III at 222, 268.)

26. Lyon left a voice mail message for his subordinate Greg Mohr on February 28, 1996, stating that he had accepted employment with Glaxo Wellcome, plc. (Tr. V at 711.) The following day, Lyon left another voice mail message with Greg Mohr asking Mr. Mohr not to reveal the information to anyone because Lyon was having difficulty finalizing his severance package. (Tr. V at 712.)

27. At Merck Frosst, Lyon was involved in preparing the communications plan to be used with Merck Frosst employees who would not be joining the joint venture. The plan contained information regarding severance packages. (Lyon Dep. III at 260–67 and Ex. 26.)

28. Under the plan, Lyon would receive enhanced stock options of $250,000 and approximately $80,000 in severance benefits if

his job at Merck Frosst was eliminated because of the joint venture and he did not accept a position with the joint venture. If he resigned because he had accepted a position with another company, he would not have these benefits. (Tr. VI at 881–84.)

29. Whatever the reason, Lyon was not forthright in his representations to plaintiffs regarding his employment with Glaxo, even after he had secured the position.

E. *Plaintiffs' Claimed Trade Secrets and Lyon's Access.*

30. Plaintiffs claim Lyon had access to and Glaxo threatens misappropriation of six categories of trade secret information: (1) consumer insights, (2) professional insights, (3) information regarding line extensions—or new dosage forms—for Pepcid® AC, (4) clinical information, (5) information regarding plaintiffs' supply cost of their active ingredient, famotidine, and (6) information relating to the launch of Pepcid® AC in Canada.[2]

31. *Consumer Insights.* Plaintiffs claim that certain consumer insights they have learned through years of consumer research warrant trade secret protection.[a] For the reasons set out in paragraphs 32—37, the Court finds that these insights are of marginal competitive value to Glaxo, and are either already known or readily ascertainable.

32. Glaxo has submitted the affidavit of Sheila Kumar, from the market research department of Warner Lambert, Glaxo's marketing arm for switch products. Several exhibits are attached which show that Glaxo, through Warner Lambert and Warner Wellcome, has closely monitored plaintiff's advertising of Pepcid® AC. (Kumar Aff.Ex. 1, 4.) Warner Wellcome conducted consumer research which revealed, among other things, that Pepcid® AC was rarely recognized as a former prescription drug, (Kumar Aff.Ex. 7 at L00104); that Pepcid® AC was viewed as a preventative medicine to be taken before meals, (*Id.* at L00106); that the prevention claim had a negative effect in that some

consumers appeared reluctant to take Pepcid® AC without knowing they needed to, (*Id.* at L00107); and that. Pepcid's small dosage form conveyed strength, duration, and economy, (*Id.* at L00107–109).

Warner Wellcome also purchased a BASES study in April, 1995, in preparation for the United States launch of Zantac® 75. (Kumar Aff.Ex. 9.) This study noted, among other things, that prescription heritage did not appear to be one of the primary appeals of Zantac® 75. (*Id.* at L00219.) This study was conducted before any H2 blockers were available over-the-counter in the United States.

Glaxo also presented a July, 1995 study of a Pepcid® AC commercial which revealed that prescription heritage was a secondary idea, and that the commercial's brand switching persuasion was highest among heavy antacid users and women. (Kumar Aff.Ex. 11 at L00553–4.)

33. Through the affidavit of Tamara Burkett, a Marketing Research Associate at Glaxo Wellcome Inc., Glaxo has submitted a September 11, 1992 report entitled "Market Overview of Prospects for Over–The–Counter Zantac," and an October 1995 Healthcare Market Research report entitled "The OTC H–2 Profile, Pepcid AC/Tagamet HB." (Burkett Aff.Exs. 1 and 2.) The purpose of the 1992 study was to analyze the prospects for over-the-counter Zantac. (Burkett Aff. Ex. 2 at 000767.) It shows that in 1992 Glaxo was aware that "[h]eavy antacid users are *key* to OTC Zantac success." (*Id.* at 000829.)

The October 1995 report represents the second part of a three part study of Pepcid® AC and Tagamet® HB purchasers. This report reviews the average price paid for these products, how purchasers first heard about them, whether the purchasers had previously used analogous prescription products, products being supplemented by Pepcid® AC and Tagamet® HB, the conditions being

---

**2.** In order to preserve any secrecy in the event that the court is incorrect in its assessment of the information plaintiffs claim as trade secret, the court will refer to the claimed trade secret information only indirectly in the body of this opinion. To facilitate appellate review in this action, more detailed findings of fact with citations to the record are contained in endnotes, which will be kept under seal at this time. The record in this action has also been filed under seal.

treated, purchasers awareness of promotion, and demographics. (Burkett Aff.Ex. 1.)

34. Glaxo is currently advertising Zantac® 75's prevention claim by stating that "Just one Zantac® 75 helps prevent acid production for up to 12 hours." (Coughlin Decl. Exs 3–5.)

35. While aware that prescription heritage is a secondary factor for Pepcid® AC, Glaxo has chosen to rely on and emphasize Zantac® 75's prescription heritage in current advertising in the United States. (Coughlin Decl. Exs 2–4.)

36. Successful marketing requires an understanding of the consumer's perception of the particular drug. (Tr. I at 117.)

37. The Court finds that Glaxo, without Lyon's assistance, has obtained certain insights from tracking and reviewing plaintiffs' advertising and from conducting its own consumer research.[b] One insight Glaxo does not appear to be currently aware of is readily ascertainable through the same methods. Further, in light of Glaxo's knowledge of other insights of plaintiffs, Glaxo's current advertising campaign reveals that such insights are not necessarily transferable to Zantac® 75.

38. *Professional marketing insights.* Plaintiffs also claim a trade secret in certain insights in promoting Pepcid® AC to healthcare professionals.[c] Specifically, witness Bill Wladika, Group Product Director for J & J*Merck, testified that he shared with Lyon in October 1995, the results of a study of physician reaction to a head to head comparison of the strength and duration of action of Pepcid® AC versus Zantac® 75. (Tr. V at 808; Pls.Ex. 29 at P004136.) At the time of the hearing the literature on this comparison was not yet released but was ready to be released upon the launch of Zantac® 75. The Court finds that the specific insight to which plaintiffs refer is readily ascertainable and not of great value to Glaxo.

39. *Line extensions.* Plaintiffs claim Lyon had access to trade secret information regarding projected launch dates and the development status of Pepcid® AC line extensions, or new dosage forms. The Court finds that information about projected launch

dates is not generally known or readily ascertainable. The information is competitively valuable because it may be used by Glaxo to prioritize and concentrate its efforts on certain Zantac® 75 line extensions, enabling Glaxo to be first to market with competitive dosage forms. (Lyon Dep. III at 274 and Ex. 27 at 002797.) The information about the mere development of these line extensions is both more generally known and readily ascertainable.

40. During an October 11–12, 1995, meeting, Stacy Kessel, a product director in the new products group of J & J*Merck, met with Lyon to discuss Pepcid® AC line extensions. During this meeting Kessel provided Lyon with a detailed update on the status of various line extensions,[d] including among other things problems encountered in developing new dosage forms, schedules for launching the different dosage forms, technologies being considered and their effect on launch dates, market research and positioning of the new dosage forms, and packaging. The information Kessel provided was based on October, 1995, projections. (Tr. IV at 495.)

41. Information regarding the status of proposed launches, when New Drug Applications were to be filed with the FDA, and business plans for line extensions and new dosage forms were shared with Lyon through his involvement in the RPCM (Research, Production, Control and Marketing) Steering Committee which later became the Business Team Steering Committee. (Pls.Ex. 19.) The committee reviews the progress of clinical, regulatory and pharmaceutical issues, strategies of the joint venture, and makes decisions regarding these issues. (Tr. IV at 517.) Lyon attended the July 14, 1995, RPCM meeting and received a copy of the minutes of that meeting. (Pls.Ex. 19.) The minutes reveal that various line extensions were discussed.

Lyon received copies of the minutes from the November 7, 1995, Business Team Steering Committee. These minutes also contain information regarding difficulties encountered with certain line extensions, expected dates for filing an NDA, and contemplated studies. (Pls.Ex. 4.)

42. The technology underlying one of the line extensions,[e] which the Court shall refer to as "L.E. One" to maintain any secrecy, is generally available. The Journal of Clinical Pharmacology published an article on this dosage form in 1995. (Def.Ex. 14; Tr. IV at 498–500.)

43. That plaintiffs would develop L.E. One is readily ascertainable as it has been available in prescription form for almost three years. Competitors will examine another's line extensions on their prescription product to predict OTC line extensions. (Tr. II at 301–03.) That plaintiffs would encounter problems[f] with L.E. One is readily ascertainable through investigation and inquiry typically performed by technical lab-science personnel in the pharmaceutical industry.

44. Plaintiffs' attempt to develop another line extension[g], "L.E. Two," is also readily ascertainable. Plaintiffs themselves have investigated SmithKline Beecham's development of such a product. (Tr. II at 308–09.) It is available, public information that a trademark for Mylanta® AC was applied for in April, 1993. (Def.Ex. 15.) From this information it is readily ascertainable that plaintiffs would develop L.E. Two. . . .

45. There is no evidence that Lyon was provided with specific information regarding L.E. Two's formulation, the size of the tablet, the dosage, or whether L.E. Two would be a primary versus a secondary product—all of which plaintiffs' witness Curtis Selquist testified would be confidential. (Tr. II at 305–06.)

46. The fact that another line extension[h], "L.E. Three," is coming on the market is generally known in the business. (Tr. II at 282.) Insights plaintiffs have regarding how and to whom to promote L.E. Three is generally known in the pharmaceutical industry. (Tr. II at 283.)

47. It is readily ascertainable that plaintiffs would produce another line extension[i], "L.E. Four." as McNeil products is in possession of the special technology used to produce that dosage form. (Tr. II at 294–95.)

48. Warner Wellcome anticipates that a gel cap/gel tab, a combination product with Mylanta, and a fast dissolve product will be developed. (Kumar Aff.Ex. 2 at L00026.)

49. In contrast, it does not appear that plaintiffs' projected launch dates for the line extensions are generally known or readily ascertainable. Lyon was made aware of plaintiffs projected launch dates, projected dates for regulatory filing, the need for further clinical research on line extensions, and business plans for the line extensions through his meeting with Kessel and through his involvement in the RPCM/Business Team Steering Committee.

50. Projected launch dates are not always met.[j] However, this does not eliminate all competitive value of the information. Knowledge of projected launch dates, whether met or not, would allow Glaxo to determine plaintiffs' priorities and to competitively align their own priorities. Plaintiff has asserted that the knowledge of the projected launch dates and the developmental status of Pepcid® AC line extensions retains competitive value for approximately two years, approximately the amount of time it takes to get the line extension to an FDA filing and out of a company's hands. (Tr. VI at 948.) Defendants have not shown that this time period is unreasonable for this type of information in the industry.

51. *Clinical Information.* Plaintiffs claim Lyon has knowledge of trade secret clinical information. The Court finds none. The Court finds that of the studies plaintiffs have shown to be confidential, the information revealed to Lyon is readily ascertainable and would not have significant competitive value for Glaxo.

52. Lyon received copies of the "OTC Monthly Highlights," a summary/review of critical clinical and regulatory issues confronting plaintiffs' product portfolio and competitive activities. These documents, (Pls.Exs. 6–10), do not contain detailed information, but do reveal information such as whether results were favorable or not, the status of particular studies, and enough information regarding the nature of the studies such that one could determine the advertising claims or regulatory approval being pursued.

53. Lyon received copies of the minutes of meetings of a Pepcid Market Support Study Clinical Task Force from an October 1995 meeting, (Pls Ex. 21), and a December 1995 meeting, (Pls Ex. 20). (Lyon Dep. I at 141.) These documents contain more detailed information regarding clinical studies, the claims they were to support, draft results, and clinical priorities.

54. Lyon also received information on clinical studies through his participation in the RPCM/Business Team Steering Committee meetings. (Pls.Exs. 3–5.)

55. The clinical research that witness Bill Wladika shared with Lyon regarding the head to head comparison with Zantac 75 is no longer confidential as Wladika stated that this research was ready for release upon Zantac 75's launch, which occurred only days after Wladika testified.

56. Plaintiffs have at times presented their clinical studies and/or the results of the studies for publication and peer review. (Tr. IV at 606–619.) Plaintiffs have completed 48 studies on Pepcid® AC and twenty are ongoing. Of these, plaintiffs have published six definitive publications and seven abstracts. (Id. at 606.)

57. Plaintiffs were required to provide detailed clinical information at a public FDA advisory committee presentation to support their submission for the approval of Pepcid® AC. It is industry practice to attend such FDA presentations of competitors as competitive information has to be disclosed to the FDA advisory panel in order to obtain approval. (Tr. II at 285–87.)

58. Plaintiffs have also produced certain clinical studies supporting their advertising claims of duration and time of onset in litigation relating to the advertising claims of Pepcid® AC and Tagamet TB in the United States District Court for the Southern District of New York, *Johnson & Johnson–Merck v. Smithkline Beecham*, 95 Civ. 7688 and *Smithkline Beecham v. Johnson & Johnson–Merck*, 95 Civ. 7011, 906 F.Supp. 178 (S.D.N.Y.1995). Glaxo has provided the Court with copies of the transcripts, exhibits and affidavits from these proceedings wherein information regarding numerous clinical

studies was revealed. The proceedings and the record in New York were open to the public, although trial exhibits themselves have not been filed in the clerk's office and have generally been available only to counsel and court personnel. (Steven A. Zalesin Aff. May 6, 1996.)

Additionally, Glaxo has provided copies of the clinical studies themselves which were used in the New York litigation but not admitted into evidence. These copies were originally obtained from plaintiffs as part of discovery in the instant case. (Karen Johnson Aff. May 6, 1996.) There is a dispute regarding whether this information is publicly available. However, this dispute need not be resolved as plaintiffs have not shown that Lyon had access to as much or more detail regarding the clinical studies than was actually revealed in evidence in the New York litigation.

59. Because the purpose of clinical studies is to support marketing claims, the confidential nature of the mere existence of certain studies is lost once those marketing claims are public.

60. Plaintiffs clinical study Pilot # 077 remains confidential. This study was conducted to support claims comparing Pepcid® AC with a competitive product.[k] The only evidence produced that Lyon may have had knowledge of this particular study is that it was noted in the OTC monthly highlights, (Pls.Ex. 6), and in the minutes of the Pepcid® AC Market Support Study Clinical Task Force Meetings in January, (Pls.Ex. 20 at P004154). The OTC Monthly Highlights do not indicate what claim is being supported by the study. While the claim is mentioned in the minutes of the January Task Force Meeting, there is no evidence that Lyon retained a copy of this document.

61. It is an industry practice to conduct clinical studies comparing competitors' products in order to make comparative analyses. (Tr. II at 277.) Therefore, Glaxo could determine that plaintiffs would be conducting clinical study # 077.

62. Plaintiffs also point to study # EP332, in support of another Pepcid® AC claim.[l] While Lyon may know plaintiffs are

conducting such a study, plaintiffs do not show that Lyon had access to any competitive information about the study, as it is noted only briefly in the minutes of the January Task Force Meeting. That plaintiffs would be pursuing such a claim is readily ascertainable in light of the fact that Zantac has a twelve hour duration claim, (Coughlin Decl.Exs. 3–5), and plaintiffs have already advertised a nine-hour duration claim, and since the onset of Pepcid® AC has been disputed in litigation in the Southern District of New York, where clinical studies comparing the onset of Pepcid® AC with a placebo and with Tagamet HB were discussed in open court. (*Johnson & Johnson\*Merck Consumer Pharmaceuticals Co. v. Smith-Kline Beecham Consumer Healthcare, L.P.*, 95 CV 7688, Transcript, September 13, 1995, at 11, 27–35.)

63. Lyon's knowledge that plaintiffs' are conducting certain clinical studies may provide the impetus for Glaxo to start similar studies. (Tr. V at 839.) Any such knowledge might also be used by Glaxo to competitively prioritize projects. (Tr. III at 433–34.) However, plaintiffs have not shown Lyon had sufficient knowledge, beyond that which is readily ascertainable, of studies # 077 and EP332 to assist Glaxo in such a manner.

64. *Supply Cost of Famotidine.* Plaintiffs claim Lyon knows trade secret information about their supply price for Pepcid® AC's active ingredient, famotidine.[m] The Court finds that Lyon had access to competitively valuable information regarding the nature of plaintiffs' famotidine supply agreement and its impact on plaintiffs' cost of goods, and that this information is not generally known or readily ascertainable. The information has competitive value in that it could enable Glaxo to determine plaintiffs' profit margin. However, because plaintiffs' famotidine supply agreement has been and is subject to change, Lyon's knowledge of it has a limited time value.

65. *Canadian launch of Pepcid® AC.* Plaintiffs claim Lyon knows trade secret information regarding the Canadian launch of Pepcid® AC. The Court agrees. Lyon had access to competitively valuable information regarding the 1996 Pepcid® AC Marketing·

Launch Plan. This information is not generally known or readily ascertainable.

66. During his employment with Merck Frosst in Canada, Lyon was increasingly involved in the Canadian launch of Pepcid® AC. He reviewed, revised and edited drafts of the Pepcid® AC marketing launch plan, which contained information such as planned expenditures in various areas. (Tr. V at 684–85; Pls.Exs. 24 & 25.)

67. Since Lyon's review of the marketing plan, employees of McNeil who are assigned to the joint venture with Merck Frosst have taken over responsibility for marketing. (Tr. V at 740–41, 756–58, 777–81.) However, the current Pepcid® AC 1996 Marketing Launch Plan, (Pls.Ex. 24), was approved by Gary Lyon. (Tr. V at 780.)

68. Lyon also commissioned a BASES study profiling the market into which Pepcid® AC would be launched in Canada. (Lyon Dep. II. at 186–87; Tr. V at 678–79; Pls.Ex. 23.)

69. The data, or at least portions of the data, in the BASES study is no longer current. Plaintiffs' witness Greg Mohr testified that he received new figures in mid to late February. (Tr. V at 739.)

70. A study such as the BASES study would not be given to a competitor. (Lyon Dep. II at 187.)

71. There are erroneous assumptions in the BASES study, namely that Tagamet® HB would follow Pepcid® AC, and that another form of Pepcid® AC was ready for launch. (Tr. V at 755.)

72. Lyon found fault with other BASES studies conducted for plaintiffs. (Lyon Dep. I, at 208, 154, 200–01.)

73. The information Lyon obtained relating to the 1996 Canadian Pepcid® AC marketing launch plans is not generally known or readily ascertainable. It has competitive value for Glaxo because the knowledge of what plaintiffs' marketing strategy and plans are would allow Glaxo to determine how to market against plaintiffs. (Tr. V at 686.) Regarding the BASES study, it lacks competitive value because it is not reliable. Fur-

thermore, there is no evidence Lyon retained a copy of the study.

74. *Plaintiffs' efforts to maintain confidentiality.* In this case, plaintiffs have shown that the nature of their famotidine supply agreement, the projected launch dates for various Pepcid® AC line extensions, and their 1996 Canadian Pepcid® AC marketing launch plans constitute competitively valuable information which is not generally known or readily ascertainable through independent development. The Court finds that plaintiffs' efforts to maintain the secrecy of this information were reasonable under the circumstances.

75. Plaintiffs did not follow their own written policies for handling sensitive or confidential information. Merck Frosst's written policy, dated March 27, 1992, outlined the procedure for protecting its paper-based documents against loss, improper use, or unauthorized disclosure. Under that policy documents were to be designated either "critical," "restricted," or "confidential." (Def.Ex. 24 at P005647.)

76. Plaintiffs concede that one document stamped "restricted," contains no confidential information. The document contains information presented to key Canadian retail accounts. (Pls.Ex. 27; Tr. V at 708–10, 722–24.)

77. Not all Merck Frosst employees were aware of the confidentiality policy. (Tr. V at 716.)

78. To maintain confidentiality, plaintiffs rely on the confidentiality agreements signed by their employees, including Lyon. (Tr. II at 218, 349.) As a condition of employment with Merck, Lyon signed a confidentiality agreement on October 17, 1990, which provides:

I will not, during or at any time after the period of my employment by the Company, use for myself or others or divulge or convey to others any information, knowledge, data or property relating to the Company's business, developed, learned, or in any way obtained by me during the course of my employment other than published material properly in the public domain, unless authorized by the Company in

writing or by established Company procedures. This includes but is not limited to: information, knowledge, data, or property concerning any process, apparatus or product manufactured, used, developed, investigated or considered by the Company.

(Complaint, Ex. B.) When he joined Merck Frosst in Canada, Lyon signed another confidentiality agreement which provided that:

The employee further agrees to hold in strict confidence and not to divulge to others nor to make use thereof, except for the purpose of MFCI, both during and after such employment, all information concerning the methods of manufacture, machines, products, designs, drawings, patterns, formulae, pharmacological or chemical data, or test data of any kind, inventions, patent applications, sales, costs, expenses, trademarks, or other subjects, which are within the exclusive control of MFCI or its affiliated companies or wholly or partially owned subsidiary companies.

(Complaint, Ex. A.) This agreement was signed on March 1, 1992. (Lyon Aff. ¶ 39.)

79. Lyon did not sign any agreement with plaintiffs which included a covenant not to compete, or which otherwise expressly restricted his future employment.

80. Plaintiffs have in the past sought and obtained such agreements with other former employees who left to work for competitors. For example, in April, 1992, Raymond F. Rizzo signed an agreement entitled "Employment Secrecy Agreement (With Covenant Against Conflicting Employment)" with J & J*Merck. (Affidavit of Thomas F. Curnin, sworn to on May 6, 1996, attachment) Mr. Rizzo later went to work for Warner Wellcome Consumer Health Products. Additionally, plaintiffs negotiated a non-compete agreement with Edward F. Chase by payment of $153,462.00 after he left plaintiffs' employment. (Def.Ex. 23.)

81. In light of Lyon's representations to plaintiffs that he was not going to a competitor, plaintiffs' failure to obtain a noncompete agreement was not unreasonable.

82. To maintain confidentiality, plaintiffs also rely on limited distribution of confidential information to only those within the orga-

nization with a need to know, and on a general knowledge in the industry, particularly among high level personnel, that certain information is confidential. (Tr. I at 127; Tr. V at 700.) Indeed, Lyon himself was aware that certain information was of the nature that it should not be given to a competitor, even though the information, in document form, was not stamped confidential or restricted. (Lyon Dep. III at 104–6.) .

## II.

### Conclusions of Law

■ A preliminary injunction is an extraordinary remedy granted only when a moving party clearly establishes entitlement to such relief. *Federal Leasing, Inc. v. Underwriters at Lloyd's,* 650 F.2d 495, 499 (4th Cir.1981). The power to issue a preliminary injunction enables the court to preserve the status quo of the parties' pending final adjudication where irremediable injury would otherwise result. *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 194–5 (4th Cir.1977).

In granting such relief, the court must apply the "hardship balancing test" as stated in *Blackwelder, supra.* Under this test, the movant bears the burden of establishing that the following factors support granting the injunction: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991)).

■ To support an injunction, plaintiff must make a clear showing of actual and immediate irreparable harm that is neither remote nor speculative. The court will then balance the likelihood of irreparable harm to the plaintiff if the injunction is not granted, against the likelihood of harm to the defendant if the injunction is granted. If the balance of harms

'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if

'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' As the balance tips away from the plaintiff, a stronger showing on the merits is required.

*Direx Israel, supra,* 952 F.2d at 813 (quoting *Rum Creek,* 926 F.2d at 359 (citations omitted)). Where the balance does not strongly favor plaintiff, a preliminary injunction should be granted only where plaintiff shows a "substantial likelihood of success," or a likelihood of success by "clear and convincing evidence." *Id.* at 818.

■ *Irreparable Harm to Plaintiff.* In this case, to the extent there are trade secrets, the chief, cognizable injury presented by plaintiffs consists of the apprehended loss of claimed trade secrets. Plaintiffs assert that revelation of these trade secrets will immediately cause them to lose a significant portion of their market share in the H2 antagonist category. It is true that in most instances, courts presume irreparable harm where a trade secret has been misappropriated. *See Lumex, Inc. v. Highsmith,* 919 F.Supp. 624, 628 (E.D.N.Y.1996). North Carolina courts recognize that

> misappropriation of a trade secret is an injury of 'such continuous and frequent recurrence that no reasonable redress can be had in a court of law.' The very nature of a trade secret mandates that misappropriation will have significant and continuous long-term effects. The party wronged may forever lose its competitive business advantage or, at the least, a significant portion of its market share.

*Barr–Mullin, Inc. v. Browning,* 108 N.C.App. 590, 597, 424 S.E.2d 226, 230 (1993).

Glaxo not only rejects plaintiffs' assertion of trade secrets, but also claims that any injury suffered by plaintiffs may be compensated by means other than injunctive relief. Glaxo relies on *FMC Corp. v. Cyprus Foote Mineral Co.,* 899 F.Supp. 1477, 1483 (W.D.N.C.1995), for this proposition:

> North Carolina's Trade Secrets Protection Act provides a wide range of relief to

which FMC would be entitled including royalties, actual and punitive damages, and attorney's fees. Although the damages will be difficult to calculate, they do not seem incalculable... Also, both parties agree that they are the only two manufacturers of these lithium products in America, so it seems likely that FMC will be able to show whether its market share has been diminished, and also, to connect that diminution in market share to the [divulging of the alleged trade secret].

*Id.* Glaxo claims plaintiffs can "sue for monetary damages in an amount calculated by comparing Plaintiffs' anticipated market share in the ordinary course of business with the actual market share after any misappropriation of trade secrets has been proved." (Docket no. 67 at 167–68, ¶¶ 28–29).

The Court does not share Glaxo's view. Using such a standard to calculate damages with any degree of accuracy would be an insurmountable task. Unlike the situation in *FMC Corp.*, anticipated market share would have to be determined. This involves far more speculation than determining the relevant diminution in market share involved in *FMC Corp.*, particularly because the OTC H2 antagonist market is new and continually changing. Additionally, factors such as the entry into the market of other competitors such as Axid® over-the-counter, and of line extensions of all the competitors would have to be considered. The Court is satisfied that if plaintiffs were to actually lose important trade secrets, they would suffer immediate and irreparable harm.

*Harm to Glaxo.* Glaxo has now launched Zantac® 75 in the United States. Zantac® 75 has been available over-the-counter in the United Kingdom since early 1995 and is now the leader in that OTC H2 antagonist market, over both Pepcid® AC and Tagamet® HB. Glaxo has obtained this success without Lyon. Moreover, even if Lyon is prohibited from involvement with Zantac 75 pending trial of this case, Glaxo has indicated that there are several duties he may still perform. Thus, the harm to Glaxo of an injunction prohibiting employment of Lyon likely would be minimal. Consequently, at this point, the balance of harms tips decidedly in plaintiffs' favor. However, as will be discussed later, there are other interests at play here, not the least significant of which is Lyon's right to employment to earn a living.

*Likelihood of Success.* Accepting for the moment the view that the balance of harms tips decidedly in plaintiffs' favor, plaintiffs need only "raise questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Direx Israel, supra,* 952 F.2d at 813 (quoting *Rum Creek,* 926 F.2d at 359 (citations omitted)). In this case, plaintiffs claim Glaxo threatens misappropriation of their trade secrets and confidential information.

In this diversity case this court has applied the choice of law rules of North Carolina and determined that North Carolina law applies to plaintiffs' misappropriation of trade secrets claim.[3] This claim arises under the North Carolina Trade Secret Protections Act, N.C.Gen.Stat. §§ 66–152–66–157 (1992). The Act provides that

> actual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action and shall be permanently enjoined upon judgment finding misappropriation for the period that the trade secret exists plus an additional period as the court may deem necessary under the circumstances to eliminate any inequitable or unjust advantage arising from the misappropriation.

N.C.Gen.Stat. § 66–154(a).

To be entitled to relief, plaintiffs must prove the existence of trade secrets. Under

---

**3.** Additionally, both parties have briefed this issue under North Carolina law. A ruling is pending on the choice of law issue as it relates to Glaxo's motions to dismiss for failure to join an indispensable party and *forum non conveniens.* In those motions, Glaxo urges the court to apply Canadian law. For the preliminary injunction, Glaxo has not cited Canadian law or shown how it would apply. Glaxo may be enjoined in this case because 90% of Glaxo OTC personnel are here in North Carolina, Lyon will necessarily be involved with them, and plans to attend quarterly meetings here. If there is misappropriation of plaintiffs' trade secret information, at least some of that misappropriation will occur in North Carolina.

the North Carolina Trade Secrets Protection Act, a trade secret means

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
>
> The existence of a trade secret shall not be negated merely because the information comprising the trade secret has also been developed, used, or owned independently by more than one person, or licensed to other persons.

N.C.Gen.Stat. § 66–152(3).

Plaintiffs must also prove a real threat of misappropriation. Under the Trade Secrets Protection Act misappropriation means

> acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret.

N.C.Gen.Stat. § 66–152(1). A plaintiff may establish misappropriation by introducing substantial evidence that the defendant both "(1) [k]nows or should have known of the trade secret, and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C.Gen.Stat. § 66–155. A defendant may rebut such a showing by introducing substantial evidence that the defendant otherwise rightfully acquired the information. *Id.*

■ In this case, plaintiffs have shown that the nature of their famotidine supply agreement, projected launch dates of various Pepcid® AC line extensions, and the 1996 Canadian Pepcid® AC marketing launch plan constitute competitively valuable information not generally known. However, this information is also subject to rapidly being outdated and is subject to some extent to independent development. Plaintiffs efforts to maintain the secrecy of this particular information were reasonable under the circumstances. Plaintiffs could have conducted a more extensive exit interview with Lyon, and pursued a contract including a covenant not to compete. On the other hand, Lyon indicated to plaintiffs that he would not be joining a competitor. In light of this representation, plaintiffs failure to pursue a non-competition agreement is not determinative, and their reliance on earlier confidentiality agreements, verbal reminders, and industry practice may be somewhat more reasonable.

■ Plaintiffs have shown that they are likely to succeed at trial in proving that the nature of their famotidine supply agreement and the projected launch dates of various Pepcid® AC line extensions constitute trade secret information. Plaintiffs have not to date shown any actual misappropriation but rather only a threat of misappropriation. Plaintiffs seek an injunction based on threatened misappropriation under a theory of "inevitable disclosure." Under this theory, "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1269 (7th Cir.1995).

In *PepsiCo,* plaintiff Pepsico brought suit in part under the Illinois Trade Secrets Protection Act against a former employee, Redmond, and his new employer Quaker Oats Company. The companies have competing products—Quaker's "Gatorade" competes with Pepsico's "All Sport," and Quaker's "Snapple" competes with Pepsico's "Ocean Spray" products. *Id.* at 1264. Redmond was a General Manager for Pepsico in California and was to be Vice President—Field Operations for Gatorade, with Quaker. At Pepsico, Redmond was privy to confidential information regarding pricing structure, strategic marketing plans, and "attack plans" for specific markets. *Id.* at 1265. At Quaker, Redmond would have "substantial input

as to Gatorade and Snapple pricing, costs, margins, distribution systems," etc., giving Quaker an unfair advantage over Pepsico. *Id.* at 1266. The trial court found that disclosure of P.epsico's confidential information was inevitable—unless Redmond "possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about Gatorade and Snapple by relying on his knowledge of [Pepsico's] trade secrets." *Id.* at 1269. It found Redmond took with him knowledge of particular plans and processes and not just general skills and knowledge. It also found that Quaker pursued Redmond. Further, "Redmond's lack of forthrightness on some occasions, and out and out lies on others," led the trial court to believe Redmond "could not be trusted to act with the necessary sensitivity and good faith," *Id.* at 1270. As a consequence, the trial court issued an injunction prohibiting Redmond from assuming his responsibilities for Quaker for a period of six months, and preventing him forever from disclosing Pepsico's trade secrets and confidential information. *Id.* at 1272. The Seventh Circuit affirmed. But, it noted that the facts did not "ineluctably dictate" an injunction. *Id.* at 1271.

▮ In its motion to dismiss, Glaxo submits that courts in North Carolina have refused to apply the "inevitable disclosure" theory. (Docket no. 14 at 17–18.) Glaxo cites *FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F.Supp. 1477 (W.D.N.C.1995); *Union Carbide Corp. v. Sunox, Inc.*, 590 F.Supp. 224 (W.D.N.C.1984), and *Travenol Laboratories, Inc. v. Turner*, 30 N.C.App. 686, 228 S.E.2d 478 (1976). These cases do not support Glaxo's argument. They do show that the courts are reluctant to grant an injunction that will prevent a person from earning a livelihood. However, the Seventh Circuit in *PepsiCo, supra*, at 1268, also recognized that important principle.

Thus, in *FMC Corp.*, the court did not determine that North Carolina courts would refuse to apply an inevitable disclosure theory. In that case, the injunction sought was so broad that it effectively precluded the former employee from doing any work in his general area of expertise. The court noted that to support such a broad injunction North Carolina courts would probably require "some showing of bad faith, underhanded dealing, or employment by an entity so plainly lacking comparable technology that misappropriation can be inferred." *Id.* at 1483. In *FMC Corp.*, the plaintiffs had failed to produce sufficient evidence of any actual or threatened misappropriation. The former employee informed the defendant at the initial interview that he would not disclose any of the plaintiff's trade secrets, and the defendant stated that it had no interest in the plaintiff's proprietary information. *Id.* at 1480. Plaintiff had also failed to produce sufficient evidence of the precise nature of its trade secret information. *Id.* at 1481.

In the case *sub judice*, plaintiffs do not seek to prevent Lyon from working in his general area of expertise, but seek to prevent him from working on a particular product, Zantac® 75. Thus, the injunction sought here might be viewed as being more narrow than that sought in *FMC Corp.*. Unlike the defendants in *FMC Corp.*, Glaxo has an interest in the type of information plaintiffs claim is trade secret. It is industry practice to monitor competitors' advertising and regulatory filings and proceedings in order to gain a competitive advantage. Furthermore, unlike the plaintiffs in *FMC Corp.*, plaintiffs here have produced evidence of the precise nature of at least a portion of the information they claim as trade secret (i.e. their famotidine supply agreement and projected launch dates for line extensions).

In *Union Carbide*, while the court did not refuse to apply the inevitable disclosure doctrine, it did state that it would not presume that disclosure of confidential information was inevitable from the facts before it. *Union Carbide, supra*, 590 F.Supp. at 228. In that case, plaintiff Union Carbide sought to restrict the geographic territory of a salesperson who went to work for a competitor and claimed breach of fiduciary duty, breach of confidentiality agreement, and deceptive trade practices. *Id.* at 227–28.[4] There was

---

4. In *Union Carbide Corp. v. Sunox, Inc.*, 590     F.Supp. 224 (W.D.N.C.1984), plaintiffs did not

no showing that the defendant took any confidential information with him to his new place of employment, and there was no evidence that he intended to disclose any information he might remember. *Id.* at 228.

In contrast, in the case *sub judice,* plaintiffs have shown that Lyon had access to trade secret information. Unlike the salesperson in *Union Carbide, supra,* Lyon's exposure to trade secret information was significant in his upper management positions with the plaintiff companies. Although plaintiffs here also did not show Lyon took particular documents with him, his memory is sufficient. On the other hand, like the plaintiffs in *Union Carbide,* plaintiffs here have produced no evidence that Lyon intends to disclose trade secret information.

The final case which Glaxo relies upon is *Travenol Laboratories, supra.* While decided before the enactment of North Carolina's Trade Secrets Protection Act, it is a persuasive indication of how North Carolina courts would handle the instant case. And, it is worth noting that the reasoning in *Travenol* is consistent with the legal principles applied by the courts in the above-discussed cases.

In *Travenol,* plaintiff Travenol Laboratories sought to prevent a former employee, defendant Turner, from working for a competitor, defendant Cutter Laboratories. Both companies were involved in the manufacturing process of plasma fractionation. *Travenol, supra,* 30 N.C.App. at 689, 228 S.E.2d at 481–82. At Travenol, Turner was employed as a production manager. *Id.* at 693, 228 S.E.2d at 484. He was hired in a similar capacity at Cutter, but was not sought out in a manner which might imply that the competitor desired access to his confidential information. The trial court refused to enjoin the former employee from working for Cutter as a manager of plasma fractionation, but did enjoin him from "revealing any of plaintiff's trade secrets, and 'all information regarded as confidential,' including information concerning the mechanical modification by plaintiff of the Westphalia centrifuge," and enjoined Cutter from seeking to obtain the information. *Id.* at 690, 228 S.E.2d at 482, 484.

Travenol claimed that disclosure would be inevitable if Turner was to perform his job as a production manager diligently and to his utmost ability. *Id.* at 693, 228 S.E.2d at 484. The North Carolina Court of Appeals affirmed the trial court's refusal to enjoin Turner's employment in a production management capacity, noting that "North Carolina courts have never enjoined an employee from working for a competitor merely to prevent disclosure of confidential information." *Id.* at 693, 228 S.E.2d at 484. However, the Court of Appeals disapproved of that part of the injunction prohibiting Turner from revealing "all information regarded as confidential," noting that such an injunction would be so broad that Turner "may be deprived of the right to use his own skills and talents in his work for Cutter." *Id.* at 695, 228 S.E.2d at 485.

The *Travenol* court established certain basic principles for deciding cases under North Carolina law which involved trade secrets and the right of individuals to change employers. First, it determined that the North Carolina courts are reluctant to prevent an employee from working for a competitor merely for the purpose of protecting confidential information. *Id.* at 693, 228 S.E.2d at 484. It noted that other courts have done so only when there were circumstances of bad faith or underhanded dealing and also when the competitor did not have a comparable level of technical knowledge and achievement. *Id.* On the other hand, it did recognize that North Carolina courts would enjoin the disclosure of confidential information by former employees. *Id.* at 692, 228 S.E.2d at 483. Because *Travenol* was a preliminary injunction case, it had no occasion to rule on the standards for a permanent injunction. However, it appears that the North Carolina courts employ their own version of an "inevitable disclosure rule" through the factors the *Travenol* court used in evaluating whether there would be sufficient likelihood of irreparable injury to issue a preliminary injunction.

The *Travenol* court cited a number of factors which may be considered: (1) The cir-

pursue an action under the North Carolina Trade Secrets Protection Act.

cumstances surrounding the termination of employment, (2) the importance of the employee's job or position, (3) the type of work performed by the employee, and (4) the kind of information sought to be protected and the value of the information or the need of the competitor for it. *Id.* at 692, 228 S.E.2d at 483. On the other hand, it also reaffirmed the general rule that: "[o]rdinarily, mere employment by a competitor alone will not create a likelihood of disclosure sufficient to support an injunction." *Id.* at 694, 228 S.E.2d at 485. The court emphasized that each case would depend on the facts before it. *Id.* at 695, 228 S.E.2d at 485. Thus, the *Travenol* court held that when the trade secret was clearly established and the possibility of disclosure high and the value to the competitor great, an injunction would issue even when there had been no bad faith or underhanded dealing by the former employee or the competitor. *Id.* at 694, 228 S.E.2d at 485.

The *Travenol* court found that the Westphalia centrifuge was the current subject of research and development and that competitors, including defendant, had failed to make a similar modification. *Id.* at 695, 228 S.E.2d at 485. Therefore, the information would be extremely valuable. Additionally, the former employee held a sufficiently high position in both companies and could likely make use of his trade secret information on behalf of his new employer. *Id.* at 694, 228 S.E.2d at 485. Therefore, the court of appeals approved the injunction with respect to this narrow area by prohibiting the employee from disclosing this trade secret and the employer from seeking to obtain the information. *Id.* at 695, 228 S.E.2d at 485. However, it refused to enjoin the former employee's employment in a production management capacity or prohibit him from revealing "all information regarded as confidential." *Id.* To do so, it noted, would deprive him of the right to use his own skills and talents to earn his livelihood. *Id.*

Relying on *Travenol*, it does appear that North Carolina would enjoin threatened misappropriation based upon an inevitable disclosure theory where the injunction is limited to protecting specifically defined trade secrets, but the trade secret will have to be clearly identified and of significant value. In such a situation, a showing of bad faith or underhanded dealing by the former employee or new employer would not necessarily be required. A likelihood of disclosure could be shown by the degree of similarity between the employee's former and current position, and the value of the information.[5]

In finding a likelihood of disclosure, other courts that have applied the inevitable disclosure theory have considered the degree of competition between the former and new employer, and the new employer's efforts to safeguard the former employer's trade secrets, and the former employee's "lack of forthrightness both in his activities before accepting his job ... and in his testimony," as well as the degree of similarity between the employee's former and current position. *PepsiCo, supra,* 54 F.3d at 1267; *PepsiCo, Inc. v. Redmond,* NO. 94 C 6838, 1996 WL 3965, at *20 (N.D.Ill. Jan. 2, 1996) (citing *IBM Corp. v. Seagate Technology, Inc.* 1991 U.S.Dist. LEXIS 20406, at *7 (D.Minn.1991)). These, too, are factors which are consistent with the approach adopted by the North Carolina courts.

A review of these factors in the case *sub judice* supports a finding that some misappropriation through Lyon is likely. Lyon's former position at Merck Frosst and his new position at Glaxo Wellcome involve similar responsibilities. At Merck Frosst in Canada Lyon was employed as General Manager and Director of the OTC division. In August of 1995, Lyon accepted the position of Vice–President of Sales and Marketing for the proposed Canadian joint venture with Johnson & Johnson. Lyon was responsible for

---

**5.** To support a broad injunction effectively precluding competitive employment, North Carolina courts would probably require a showing of bad faith or underhanded dealing, and that the competitor lacked comparable levels of knowledge and achievement. *FMC Corp., supra,* 899 F.Supp. at 1482 (citing *Travenol,* 30 N.C.App. at 693, 228 S.E.2d at 484). In that regard, the two protagonists in the instant case are similarly situated. While each has confidential information, it does not appear that one side has a "Westphalia centrifuge modification," advantage that the other does not.

the Canadian launch of Pepcid® AC. At Glaxo Wellcome, Lyon would be the Director, Global Marketing/International Commercial Operations, OTC. In that position, among other things, Lyon will be responsible for tying together a global strategy for Glaxo's OTC products. It appears that Lyon's new position, while broader than his position with plaintiffs, will involve responsibilities similar to his former responsibilities for plaintiffs. Also, the competition between Pepcid® AC and Zantac® 75 is intense and the stakes are high. The parties here are competing in a market that exceeded one billion dollars in sales in 1995. Here, each decision made by Lyon will be against the background knowledge of the nature of plaintiffs' supply agreement and their projected launch dates for Pepcid® AC line extensions.

The Court now turns to the circumstances surrounding the termination to see where the equities lie in that regard. First, it must be pointed out that plaintiffs did not seek a non-competition agreement from Lyon. This weighs heavily against entering an injunction which would prohibit Lyon from obtaining employment with a competitor. This failure on plaintiffs' part may also serve as an indication that the type of confidential information which Lyon possesses has a limited value. Indeed, the facts of this case do disclose that the confidential information has a limited time value. Also, there is no evidence that Glaxo thought to recruit Lyon because of his knowledge of plaintiffs' trade secrets.

On the other hand, Lyon was not entirely forthright in his representations to plaintiffs regarding his employment with Glaxo Wellcome, PLC. However, it does not appear that he was attempting to hide the truth in order to spirit off trade secrets. Rather, it seems that he wished to obtain a better severance package for himself. Thus, these facts do not disclose that a broad injunction should be issued or one which would limit Lyon's employment with Glaxo. However, Lyon's misrepresentations do provide a basis for questioning his ability to keep his word with respect to the confidentiality agreement

he has with plaintiffs. That is, if Lyon would misrepresent the truth in order to gain more money through a severance package, he might also find that the temptation to succeed in his career would be too much for him to ignore the confidential information he has about plaintiffs' operations. Therefore, the Court finds that some type of limited injunction would be appropriate. This is especially true because Glaxo has not shown that it has made any efforts to prevent potential disclosure of plaintiffs' trade secret information.

Finally, the Court looks at the value of the information to plaintiffs' competitors and their ability to produce it either specifically or in general. In this regard, plaintiffs have failed to show that their trade secrets are of the type or value which the *Travenol* court found with respect to the modifications to the Westphalia centrifuge. Rather, plaintiffs' information is general business information, the exact specifics of which might not be known to competitors, but which in general is the type of information developed by all business organizations. This supports the Court's granting a very narrow injunction. This finding is consistent with plaintiffs' own behavior. In other instances, it has obtained non-competition agreements from its employees and paid the requisite consideration for such agreements. It did not do so with Lyon. This further buttresses the finding that the information, while important, is not of critical value and, in any event, is time-dated. Consequently, it is only with respect to information regarding Pepcid® AC's famotidine supply contract, projected launch dates of Pepcid® AC line extensions, and 1996 Canadian Pepcid® AC marketing launch plans that the court finds that plaintiffs have raised questions going to the merits of their trade secrets claim which are " 'so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation' " *Direx Israel, supra,* 952 F.2d at 813 (quoting *Rum Creek,* 926 F.2d at 359 (citations omitted)).[6] In *PepsiCo, supra,* the district court also noted the former employee's "lack of forthrightness both in his activities before

---

6. As noted previously, to support a broad injunction, North Carolina courts would probably require a showing of bad faith or underhanded dealing, and may require employment with a competitor that lacked comparable levels of knowledge and achievement. *FMC Corp., supra,* 899 F.Supp. at 1482 (citing *Travenol,* 30 N.C.App. at 693, 228 S.E.2d at 484).

accepting his job ... and in his testimony" were factors supporting the court's finding that the threatened misappropriation was real. *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1267 (7th Cir.1995).[7]

*Public Interest.* In this case there are competing public interests. First, there is the interest in encouraging research and development to provide consumers with competitive, quality products by protecting trade secret information. In that regard, employers such as plaintiffs "must feel free to entrust confidential ideas and information to employees without fear that competitors will unfairly gain access to such information." *Travenol, supra,* at 691, 228 S.E.2d at 483. Second, there is the interest in "the freedom of employees to sell their expertise to the highest and most congenial bidder." *FMC Corp., supra,* 899 F.Supp. at 1484. The Court has tailored the injunction to promote both of these interests. Additionally, in order to ensure that Glaxo is not prohibited from employing Lyon's general knowledge and expertise, and that Lyon is thereby allowed to use that general knowledge and expertise, plaintiffs were required to specifically identify their trade secrets. Where alleged trade secrets were only broadly defined, plaintiffs must rely on their confidentiality agreement with Lyon. The Court cannot add to that agreement a covenant not to compete. *See Union Carbide Corp. v. Sunox, Inc.,* 590 F.Supp. 224, 228 (W.D.N.C. 1984).

### III.

*Glaxo's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted*

Glaxo has moved for dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In ruling on such a motion, the court accepts as true all well-pleaded allegations and views the complaint in the light most favorable to plaintiffs. The court will not dismiss a claim unless it appears certain that plaintiffs can prove no set of facts which would entitle them to relief. *Mylan Lab., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). However, the court is not bound by legal conclusions contained in the complaint because the purpose of Rule 12(b)(6) is to test the legal sufficiency of a complaint. *Schatz v. Rosenberg,* 943 F.2d 485, 489 (4th Cir.1991), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992).

■ Under the Federal Rules of Civil Procedure, all that is generally required to state a claim for relief is a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "In deciding whether a claim has been stated, Rule 8 of the Federal Rules of Civil Procedure requires only 'notice pleading' such that a defendant receives fair notice from the complaint of the claim and the grounds on which the claim rests." *Turner v. Randolph County, N.C.,* 912 F.Supp. 182, 184 (M.D.N.C.1995) (citing *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Regarding the misappropriation of trade secrets claim, Glaxo submits that courts in North Carolina have refused to apply the "inevitable disclosure" doctrine upon which plaintiffs rely. As discussed above, this is not the case, although North Carolina courts are not likely to apply the doctrine broadly.

Regarding the inducement to breach contract claim, Glaxo claims that plaintiffs have

---

7. Plaintiffs here do not seek to enjoin Glaxo from employing Lyon to work on products other than Zantac®, and the court has narrowly tailored the injunction to protect only precisely defined information plaintiffs are likely to prove at trial is trade secret. However, a review of the factors which would support a broader injunction is provided should Glaxo consider the injunction entered herein to be broad: While plaintiffs have failed to show bad faith or underhanded dealing by Glaxo, they have raised serious and substantial questions regarding underhanded dealing by Lyon in his representations to plaintiffs regarding his future employment with Glaxo. Lyon's lack of forthrightness provides further support that misappropriation is likely. Plaintiffs have not shown that Glaxo lacks comparable levels of knowledge and achievement in the OTC H2 antagonist market in general. Indeed, Glaxo's Zantac® 75 surpassed Pepcid® AC in sales in the United Kingdom even though it was introduced after Pepcid® AC. However, plaintiffs have shown Glaxo lacked specific knowledge regarding plaintiffs costs of goods, timing of Pepcid® AC line extensions, and 1996 Canadian Pepcid® AC marketing launch plans.

failed to adequately allege the existence of a contract, or to allege that Glaxo was aware of the contract. In their complaint, plaintiffs refer to and attach copies of two contracts, one with Merck Frosst and the other with Merck & Co. Plaintiffs have given Glaxo fair notice of this claim, and the Court does not find that plaintiffs can prove no set of facts of facts which would entitle them to relief.

■ Plaintiffs claim that "in meeting with Lyon prior to his employment with Glaxo Wellcome plc and, upon information and belief, the inevitable disclosure and use of information obtained by Lyon during his employment with Merck Frosst to launch and market Zantac® in the over-the-counter market" constitutes an unfair or deceptive trade practice in or affecting commerce. (Complaint, Docket no. 1, at 13, ¶¶ 63, 64) Glaxo claims this action cannot be pursued without alleging in-state injury. In support, Glaxo cites *The In Porters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494 (M.D.N.C. 1987), where this court dismissed under Rule 12(b)(6) an unfair trade practices claim brought by a French company against a North Carolina company under the North Carolina Unfair Trade Practices Act. The court found that the North Carolina act was limited by the commerce clause and the due process clause to "cases involving substantial effect on a plaintiff's in-state business operation." *Id.* at 502. Because the French company admitted that its business operations were restricted to France and that it did not have any business operations in North Carolina, the court dismissed its claim as falling outside the reach of N.C.Gen.Stat. § 75–1.1. *Id.*

The Court agrees with Glaxo that plaintiffs have failed to allege a substantial effect on any in-state business operations, and therefore that their claim falls outside the reach of the North Carolina Trade Practices Act. Any injury plaintiffs may suffer in North Carolina will be incidental.

### IV.

Glaxo has additionally moved to strike plaintiffs affidavits filed May 6, 1996, as untimely. (Docket no. 69.) Of these affidavits, those of Sandra Gong, Joyce Brevard and Michael Lamonthe simply provide further support for plaintiffs' contention that Lyon was not forthright in his representations regarding his future plans. These affidavits do not rebut affidavits presented by Glaxo, but contain testimony that should have been presented by plaintiffs in support of their motion for a preliminary injunction. These affidavits are therefore stricken. While these affidavits may rebut Lyon's deposition testimony, plaintiffs are not prejudiced as the Court has found in plaintiffs' favor on the matter addressed in the affidavits.

The affidavit of Ian Lang also bolsters the contention that Lyon misrepresented his future plans. The Court has already so found. The affidavit additionally offers further support for plaintiffs claim of trade secret in their Canadian marketing plan for Pepcid® AC. (Docket no. 56, Lang Aff., May 6, 1996, at 3–4, ¶ 7) The affidavit does not rebut the affidavits of Glaxo. The affidavit is therefore stricken. Like the other affidavits, it may rebut Lyon's deposition testimony. However, the Court has also found in plaintiffs' favor on the matter addressed in the Lang affidavit.[8]

### V.

Rule 65(c) of the Federal Rules of Civil Procedure states that no "preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c).

The bond posted to support the temporary restraining order in this action was $100.00. (Docket no. 8.) Glaxo had originally requested a $1,000,000 bond be posted. (Docket no. 22, Transcript of Hearing on Status Confer-

---

8. The affidavits of Karen Johnson and Steven Zalesin pertain to the issue of whether information revealed in the litigation in the Southern District of New York was kept confidential. The Court requested information regarding this issue. Glaxo has withdrawn its motion to strike these affidavits.

ence/Preliminary Injunction, at 29.) This request was denied, as no objective criteria was proffered to support the amount. (*Id.* at 30.) Both parties have now submitted further pleadings on this issue. Plaintiffs suggest a minimal bond of $5,000, claiming there is a complete absence of evidence of harm to defendant Glaxo. (Docket no. 85.) The Court agrees that Glaxo has not come forward with evidence of the harm to Glaxo, as opposed to Glaxo Wellcome, plc and/or Gary Lyon. Glaxo indicates that prospective damages "cannot be defined with specificity without the Court's order and opinion." (Docket no. 86 at 6.)

Glaxo again requests a bond of $1,000,000.[9] (Docket no. 86.) Glaxo argues that this amount reflects an estimate of prospective damages as well as damages already incurred, $700,000 in legal fees and expenses. (Docket no. 86 at 6.)

Glaxo submits that North Carolina law governs the issue of whether attorney's fees should be considered in setting the amount of the bond. They rely on *Bulova Watch Co. v. Rogers–Kent, Inc.,* 181 F.Supp. 340, 344–45 (E.D.S.C.1960), where the court, applying South Carolina law in a diversity case in an action on an injunction bond, awarded attorneys' fees after a preliminary injunction was determined to have been wrongfully granted. *See also, Federal Beef Processors, Inc. v. CBS Inc.,* 864 F.Supp. 127, 130 (D.S.D.1994) (finding that state law controls question of what damages are recoverable on a surety bond ancillary to a diversity action and awarding attorneys fees); 11A Charles A. Wright, Arthur R. Miller and Mary K. Kane, *Federal Practice and Procedure* § 2974 (2d ed. 1995) [hereinafter Wright & Miller]. The courts are not in agreement on this issue, some finding federal law controls and attorney's fees are excluded. *See Matek v. Murat,* 862 F.2d 720, 734 (9th Cir.1988) (attorney's fees may not be recovered under Rule 65(c)); *Fireman's Fund Ins. Co. v. S.E.K. Constr. Co.,* 436 F.2d 1345, 1351–52 (10th Cir.1971) (citing *Heiser v. Woodruff,* 128 F.2d 178 (10th Cir.1942)) ("[w]hen an injunction suit is commenced in federal court and

an injunction bond is issued pursuant to Rule 65(c), local state law, with respect to recovery of attorneys' fees in an action on the injunction bond, has no application."); 11A Wright & Miller § 2954, at 287.

■ This issue need not be resolved, however, as the Court finds that Glaxo's previously incurred legal fees should not be considered for two other reasons. First, if North Carolina law governs, the Trade Secrets Protection Act allows for the recovery of reasonable attorneys' fees if a claim of misappropriation is made in bad faith. N.C.Gen.Stat. § 66–154(d). However, if plaintiffs' claim were made in bad faith, defendant Glaxo's damages would not be limited to the amount of the bond posted. *See Continuum Co. v. Incepts, Inc.,* 873 F.2d 801 (5th Cir.1989). Second, damages Glaxo might recover from any bond posted to support the preliminary injunction entered herein would be limited to those suffered during the time period specified in the bond, which presumably would not include any time prior to the entry of this preliminary injunction. 11A Wright & Miller § 2973, at 468. Therefore, the Court does not find that evidence of previously incurred attorneys' fees should be considered in assessing the amount of the bond. The Court will thus require plaintiffs to post a bond of $5,000 at this time. Glaxo may request the Court to reconsider this matter. However, Glaxo must first produce some evidence of losses it may suffer as a result of its inability to discuss with Lyon the particular matters addressed below for the time periods noted.

## VI.

**IT IS THEREFORE ORDERED** that plaintiffs' motion for a preliminary injunction (Docket no. 2) is GRANTED as follows:

Glaxo and all of its officers, agents, and employees are restrained and prohibited from discussing with Lyon any pricing of Pepcid® AC or Zantac® 75 until March 1, 1997, a period of one year from the last date of his employment with plaintiffs, or until

---

9. Glaxo also filed a motion to increase the bond posted to support the TRO. (Docket no. 35) In

that motion, based upon Glaxo's interpretation of the TRO, they requested a bond of $10.4 million.

this matter is finally adjudicated, whichever occurs first.

Glaxo and all of its officers, agents, and employees are further restrained and prohibited from discussing with Lyon the line extensions of Pepcid® AC or Zantac® 75 until March 1, 1998, two years from the last date of his employment with plaintiffs, or until this matter is finally adjudicated, whichever occurs first. However, once a line extension of Pepcid® AC has been launched, Glaxo may then discuss that line extension with Lyon.

Glaxo and all of its officers, agents, and employees are further restrained and prohibited from discussing with Lyon the 1996 Pepcid® AC Canadian Marketing Launch Plans until March 1, 1998, two years from the last date of his employment with plaintiffs, or until this matter is finally adjudicated, whichever occurs first.

**IT IS FURTHER ORDERED** that pursuant to Rule 65(c), Fed.R.Civ.P., plaintiffs shall post a bond in the amount of $5,000 for the payment of such costs and damages as may be incurred or suffered by Glaxo in the event it should be later determined that it has been wrongfully enjoined. Should it choose to do so, Glaxo shall have 30 days from the date of entry of this order to file a motion for reconsideration of this amount. Such a motion must comply with the directive in the body of this opinion.

**IT IS FURTHER ORDERED** that Glaxo's motion to modify the temporary restraining order and to increase the bond (Docket no. 35) is dismissed as moot.

**IT IS FURTHER ORDERED** that Glaxo's motion to dismiss for failure to state a claim upon which relief can be granted (Docket no. 13) is GRANTED IN PART AND DENIED IN PART and that plaintiffs' seventh claim for relief is dismissed.

**IT IS FURTHER ORDERED** that Glaxo's motion to strike plaintiffs' affidavits submitted on May 6, 1996 (Docket no. 69) is GRANTED and the affidavits of Sandra Gong, Ian Lang, Joyce Brevard and Michael Lamonthe are stricken.

**IT IS FURTHER ORDERED** that the endnotes in this opinion be sealed.