**FMC CORPORATION, Plaintiff,**

v.

**CYPRUS FOOTE MINERAL COMPANY and Joseph Daniel Fickling, Defendants.**

**No. 3:95CV343–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Sept. 20, 1995.

Timothy G. Barber, Womble Carlyle Sandridge & Rice, Charlotte, NC, Lee Davis Thames, Jeffrey A. Walker, Butler, Snow,

O'Mara, Stevens & Canada, P.L.L.C., Jackson, MS, for plaintiff.

Robin E. Shea, W.R. Loftis, Constangy, Brooks & Smith, Winston–Salem, NC, for defendants.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on the Plaintiff's Motion for a Preliminary Injunction (document # 1–2). Prior to this proceeding the Plaintiff, FMC Corporation, ("FMC") sought a temporary restraining order to prevent Defendant, Joseph Daniel Fickling, ("Fickling") from performing certain services for Defendant Cyprus Foote ("Foote"). In its request for the temporary restraint, FMC alleged that if Fickling worked for Foote he would inevitably disclose FMC's trade secrets in violation of the North Carolina Trade Secrets Protection Act and Fickling's confidentiality agreement with FMC.

On August 31, 1995, a hearing was held on FMC's request for a temporary restraining order before the Honorable Graham C. Mullen, and on September 1, 1995 Judge Mullen entered a Temporary Restraining Order. Currently, FMC seeks to convert that Temporary Restraining Order into a Preliminary Injunction. The Defendants oppose FMC's request for this Preliminary Injunction. For the reasons stated herein, FMC's request for a Preliminary Injunction will be denied and the Temporary Restraining Order will be dissolved.

## I. BACKGROUND

FMC and Foote are the only two producers of battery-quality lithium products in the United States. As such they are in direct and constant competition. Although neither party has specified its market share, FMC alleges that it enjoys a distinct advantage over Cyprus Foote by reason of its superior technologies and methods for processing lithium chloride into lithium ingots.

Fickling is 48 years old. In 1969 he graduated from Clemson University with a bachelor's degree in metallurgical engineering. In 1981 he took a job with FMC's predecessor Lithium Corporation of America, which was acquired by FMC in 1985.[1] FMC employed Fickling for over fourteen years. During that time Fickling devoted substantially all of his time to scientific research and development techniques used to produce battery-quality lithium metals and alloys. According to FMC, Fickling was instrumental in inventing or developing many of FMC's current technologies. Because Fickling had access to this information, which FMC made efforts to keep confidential, in 1990, FMC secured an agreement which required Fickling to:

> maintain in confidence all information pertaining to the Company's business.... including, but not limited to, information relating to the Company's products, inventions, trade secrets, know-how, systems, formulae, processes, compositions, manufacturing techniques, machinery, equipment, research projects....

In addition, Fickling agreed not to:

> use, communicate or disclose or authorize any other person to use, communicate or disclose such information orally, in writing or by the publication, either during my employment or thereafter, except as expressly authorized in writing by the company, unless and until such information becomes generally known in the relevant trade or industry to which it relates without fault on my part.

However, FMC never asked Fickling to sign a covenant not to compete, and Fickling never did so.

According to Fickling, between about 1990 and 1994, FMC laid off a number of engineers and technical employees from his work area, and other engineers resigned voluntarily. Sometime in 1994, FMC announced that there would be more layoffs in 1997, including employees in the chemical plant. At this time, Fickling was the only employee of Li-

---

1. For convenience the Court refers to both Lithium Corporation and FMC as FMC, unless otherwise indicated.

thium Corporation still employed in his department by FMC. He was told that another individual was being hired to serve as his "back-up." According to Fickling, this combination of circumstances led him to question his job security and for that reason he began to circulate his resume. Fickling did not receive any responses.

As chance would have it, apparently, in mid–1994, Foote decided to relocate its headquarters from Pennsylvania to Kings Mountain, North Carolina. Foote's development engineer decided to stay in Pennsylvania rather than move to North Carolina. Initially, Foote tried to make due without a development engineer, but that proved unworkable so Foote hired a recruiting firm to find a replacement. According to Foote, it knew nothing about Fickling at this time, and it merely told the recruiting firm that it was looking for an engineer with knowledge of lithium. Ultimately, the recruiting firm contacted Fickling about the job at Foote. In June of 1995, Fickling interviewed with Foote. At the beginning of that interview, Fickling told Foote that he would not disclose any of FMC's trade secrets. Foote said it had no interest in FMC's proprietary information.

On July 10, 1995, Fickling resigned his position with FMC. At that time, Fickling told FMC that he was going to work for Foote. According to FMC, Fickling told them he was going to work for Foote because he had greater freedom to meet their technical challenges. It is undisputed that Foote has employed Fickling as their development engineer and that in this position he will be working in the same general areas that he worked in while employed by FMC.

FMC instituted this action against Foote and Fickling alleging breach of contract and violation of North Carolina's Trade Secrets Protection Act, N.C.Gen.Stat. § 66–152 *et seq.* In its complaint, FMC sought to enjoin Fickling from performing any work for Foote in seven general areas of research and development that Fickling had worked in for FMC. More specifically, FMC sought to prevent Fickling from performing any research and development work for Foote with respect to the following: (1) design or modifi-

cation of battery-quality lithium metal cells, (2) design or modification of battery-quality lithium foil extrusion dies and winding technology, (3) design or modification of battery-quality lithium ingot casting and purification technology, (4) design or modification of stamping techniques and technology for battery-quality lithium parts, (5) the design or modification of battery-quality lithium alloys, as well as work with respect to (6) the lamination of current-collecting materials to battery-quality lithium metals, and (7) the sealing and packaging of battery-quality lithium parts. After FMC filed suit, the parties drafted a Temporary Restraining Order at the direction of the Court. That Order was entered by the Honorable Graham C. Mullen on September 1, 1995. By its terms, the Order barred Fickling from helping Foote change its technology in the seven general areas just listed. Pursuant to this opinion that Temporary Restraining Order will be dissolved.

## II. *ANALYSIS*

■ FMC seeks a Preliminary Injunction pursuant to Fed.R.Civ.Proc. 65(d). The Fourth Circuit has long followed a four-part test to determine if an injunction is appropriate. That test requires the Court to consider:

(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,

(2) the likelihood of harm to the defendant if the requested relief is granted,

(3) the likelihood that the plaintiff will succeed on the merits, and

(4) the public interest.

*Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 195 (4th Cir.1977). In this case, the Court's jurisdiction is based upon diversity of citizenship, and FMC's claim arises, in part, under North Carolina's Trade Secrets Law. In these cases, federal courts apply the controlling state law, and when the courts of that state have not ruled on the precise question presented, the federal court is obliged to forecast how the state's highest court would rule on the issue. *Roe v. Doe,* 28 F.3d 404, 407 (4th Cir.1994).

North Carolina's Trade Secrets Protection Act provides that "[e]xcept as provided herein, actual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action and shall be permanently enjoined upon judgment finding misappropriation...." N.C.Gen. Stat. § 66–154. The statute authorizes a court to enjoin use of trade secrets or, in the alternative, to allow the defendant's continued use of a trade secret conditioned upon payment of a reasonable royalty. Gen.Stat. § 66–154(a)(1). It allows plaintiffs to recover actual damages measured by economic loss or the unjust enrichment caused by misappropriation, whichever is greater. Gen.Stat. § 66–154(b). In cases of willful and malicious misappropriation, the statute allows for punitive damages and attorney fees. Gen. Stat. § 66–154(c) & (d). With this framework in mind, the Court considers FMC's request for a Preliminary Injunction.

**1.  *Likelihood of Success on the Merits.***

The Court finds that at this stage of the proceedings FMC has not shown a likelihood of success on the merits. The reasons for this finding are two-fold. First, FMC has not come forward with evidence establishing actual or threatened misappropriation of trade secrets. Second, FMC has not come forward with evidence establishing the precise nature of its trade secrets.

■ The Court finds that FMC has not established a real threat of misappropriation. Rather, FMC has established a mere possibility of misappropriation that is insufficient to justify an injunction. This is not a case where Foote has worked long and hard to lure one of FMC's employees into its camp. Nor is it a case where FMC's employee has offered to give confidential trade secrets or taken confidential materials with him. Quite the contrary, the parties disavow any such intent. While such representations are not dispositive, in this case the Court has no reason to believe that either Defendant is misleading the Court.

Instead, from the evidence thus far it appears that Fickling decided to leave his employ with FMC for purely personal reasons. Given his highly specialized expertise, it is not surprising that he found his employment options fairly limited. In fact, it is not surprising that the only job offer he received was from another employer who had a need for his specialized knowledge. To date, the only evidence that FMC has produced in support of its threat of misappropriation is the fact that Fickling has left its employ for that of a competitor. But the fact that employers who need Fickling's expertise also compete with FMC is not enough, by itself, to justify barring Fickling from those jobs.

■ Also, FMC has not presented sufficient evidence that its processes are trade secrets. Although FMC has repeatedly asserted that this matter is uncontested, a review of the affidavits filed thus far shows this is not the case. For example, FMC seeks to prevent Fickling from working to develop battery-quality lithium cells. FMC asserts that its Anderson cell is a trade secret. Assuming this is the case, which is not at all clear from the evidence thus far, Foote has come forward with evidence that it can purchase cell technology on the market from three or four other vendors. Under these circumstances the Court simply cannot enjoin Fickling from doing any work whatsoever in the field of cell technology.

The same is true of other assertions made by FMC. For example, FMC has claimed that it has a dry room and special packaging techniques. According to Foote it has had a dry room for about seventeen years, and that it also employs vacuum packaging. FMC has also claimed that it has trade secrets with respect to the laminating of current-collecting materials to lithium metals. According to Foote, it has been laminating these materials for years. FMC also asserts that it has ultra-thin foil and a special winding capacity. Foote asserts that its foil is thinner and it has winding technology also. In other areas, FMC alleges that it has superior extrusion technology, produces superior batteries, and enjoys superior manufacturing efficiencies; FMC also claims that it produces more alloys than Foote, and that Foote's alloys have inferior tolerances. But Foote denies these claims, and based on the evidence of record, these matters are far from certain.

In short, FMC asserts that it has trade secrets that implicate almost every stage in the production of battery-quality lithium metals. But the evidence offered in support of those assertions is very general, and FMC seeks an injunction that effectively precludes Fickling from doing any work in his general area of expertise. Under these circumstances, the Court finds that FMC has not shown that its processes, whatever they are, "[d]erive[ ] independent actual or potential commercial value from not being generally known or readily ascertainable through independent development ..." Gen.Stat. § 66-152(3)(a). In fact, at this stage of the proceedings it is not clear to this Court exactly what it is supposed to enjoin Fickling from disclosing. From the evidence submitted thus far, it appears that both Foote and FMC have very similar technologies, which is not odd given the nature of their products. The Court does not know, in any detail, the specific processes FMC seeks to protect.

Rather, FMC seeks something much broader than the protection of its trade secrets to which it is entitled under North Carolina's Trade Secrets Protection Act and its confidentiality agreement with Fickling. FMC seeks to enjoin Fickling from performing any research and development for Foote in the seven general areas that he worked in for FMC. But the law and the confidentiality agreement at issue protect FMC's trade secrets etc., they do not make Fickling an indentured servant of FMC. In fact, the broad protection FMC seeks is typically obtained by means of a covenant not to compete. But there is no such covenant in this case.

FMC's theory is that if Fickling is allowed to work in these areas he will "inevitably disclose" FMC's trade secrets "knowingly or unknowingly". FMC's effort to include Fickling's "unknowing" disclosure of its trade secrets is revealing; if Fickling cannot tell when he is about to reveal FMC's "trade secrets" the Court is not sure that FMC wants to protect the kind of information protected by the law and its confidentiality agreement.

Even assuming that North Carolina would recognize this so-called "inevitable discovery" doctrine, the Court does not believe that North Carolina would apply the doctrine with the broad strokes urged by FMC. For example, in *Engineering Associates, Inc., v. Kenneth Oscar Pankow*, 268 N.C. 137, 150 S.E.2d 56 (1966), an employee left an employer and went to work for its only major competitor. The court rejected the former employer's request that its former employee be enjoined from working for a competitor under the conditions alleged. The court wrote:

The plaintiff has offered no evidence that defendant acquired knowledge of its business in bad faith, and "an employee may take with him, at the termination of his employment, general skills and knowledge acquired during his tenure with the former employer." Nor is any abuse of confidence or bad faith in later employment shown as to the defendant. He has merely exercised the privilege every citizen has of accepting employment in the field for which he is trained.

*Pankow*, 268 N.C. at 140, 150 S.E.2d 56 [citations omitted]. And in *Travenol Laboratories, Inc. v. Turner*, 30 N.C.App. 686, 228 S.E.2d 478 (1976) a former employer sought an injunction comparable to the one FMC seeks in this case. There an employer sought, *inter alia*, to prevent its former employee from working for its competitor as a means of enforcing the employee's duty not to disclose confidential information. The Court of Appeals affirmed the trial court's refusal to grant such broad relief, emphasizing that where such relief had been granted there were special circumstances including bad faith or underhanded dealing and a competitor that lacked comparable levels of technical knowledge and achievement. *Id.* at 693, 228 S.E.2d 478.

Although these cases were decided before North Carolina enacted the Trade Secrets Protection Act, they indicate that if North Carolina's courts adopted the inevitable discovery doctrine, they would not apply it in the indiscriminate manner urged by FMC. For if the doctrine is applied as urged by FMC, then no employee could ever work for its former employer's competitor on the theory that disclosure of confidential information is "inevitable." In fact, if FMC

succeeded in this case, then Fickling would not be able to market his expertise.

In urging this approach, FMC ignores the important countervailing considerations that are at issue: Fickling has a great deal of general skill and knowledge as an engineer who has worked for 14 years in the area of lithium production. That experience and his skills are "general" not in the sense that everyone has them, but rather, in the sense that they are not specific to the techniques and processes utilized by FMC. Fickling is free to sell those skills in the marketplace. The mere fact that Fickling acquired some of these skills while working for FMC does not mean that he must work for FMC or not work at all. Apparently FMC believes that after working for it, Fickling can have no general skills and knowledge. This Court disagrees. The law and his contract only oblige Fickling to refrain from disclosing confidential information particular to FMC's processes, etc. According to Fickling he has no intention of doing so and as of yet there is no evidence to the contrary.

Whatever the case, North Carolina's Trade Secrets Protection Act must be interpreted reasonably in light of these competing interests with due regard for the rights of employees and employers. And North Carolina's case-law to date indicates that its courts would refuse to enjoin an employee from working for its former employer's competitor under the doctrine of "inevitable discovery" absent some showing of bad faith, underhanded dealing, or employment by an entity so plainly lacking comparable technology that misappropriation can be inferred. FMC has made no such showing in this case.

*Barr–Mullin, Inc. v. Browning*, 108 N.C.App. 590, 424 S.E.2d 226 (1993), on which the Plaintiff relies, fits within this framework and shows the sort of evidence that justifies an injunction. In that case, there was specific evidence as to the particular trade secret, a software program, that was developed by the defendant. There was also evidence that it was practically impossible to make any substantial modification to this software absent access to its "object code." Further, there was evidence that after the defendant left his employer he began to modify that same software for the customers of his former employer. Thus far, FMC has asserted that its technology is superior in very general terms and it has not provided any evidence of the sort of blatant misappropriation present in *Barr–Mullin* that would lend weight to its misappropriation claim. In short, the Court finds that FMC has not shown that there is a real threat that its specific trade secrets will be misappropriated, and therefore FMC has not met its burden of showing a likelihood that it will succeed on the merits of its misappropriation and contract claims.

### 2. Likelihood of Irreparable Harm to FMC.

The Court also finds that FMC has not shown a likelihood of irreparable harm. For one thing, it is not clear that FMC will be harmed. But even if it is, North Carolina's Trade Secrets Protection Act provides a wide range of relief to which FMC would be entitled including royalties, actual and punitive damages, and attorney's fees. Although the damages will be difficult to calculate, they do not seem incalculable. For example, the record shows that Foote currently employs FMC to convert its lithium carbonate to lithium chloride and employs DuPont to convert its lithium chloride to lithium metal. If FMC can show that Foote uses Fickling to recreate FMC's technology in-house and, as a result, Foote is no longer obliged to use FMC or DuPont to perform these processes economically, then the fees that Foote paid to obtain these services seem a natural bench-mark for damages. Also, both parties agree that they are the only two manufacturers of these lithium products in America, so it seems likely that FMC will be able to show whether its market share has been diminished, and also, to connect that diminution in market share to the proliferation of its technology.

### 3. Likelihood of Harm to the Defendants.

In contrast, the potential harm to Fickling is very great. According to Foote and Fickling, the seven areas designated by FMC encompass just about every phase in

the production of lithium products, and certainly the area of Fickling's expertise. According to Foote, if Fickling cannot work in these areas he is useless to their company. For his part, Fickling is a 48–year–old engineer with an expertise in the production of lithium products. When he became dissatisfied with his employment and apparent prospects at FMC he circulated his resume but received no signs of interest. It looks to him like he can work for Foote or nobody.

Throughout the proceedings, FMC has asserted that continuing the injunction will not burden Foote or Fickling. According to FMC, Foote can use Fickling for any number of other tasks. The Court thinks it likely that Fickling can perform any number of tasks from typing to management, but he would rather not start a second career at this point, and Foote would rather not hire a development engineer that cannot work in his field. FMC has not made the showing that would justify the broad injunctive relief it requests, especially in light of the potential harm to Fickling.

### 4. *The Public Interest.*

Both FMC and Fickling have asserted important public interest. The protection extended to trade secrets fosters research and development and the improved products it elicits. The freedom of employees to sell their expertise to the highest and most congenial bidder is an important facet of individual liberty long-recognized by the law of North Carolina. Here the Court is required to balance those interests. On the facts of the case thus far the Court will not enjoin Fickling from working in his area of expertise simply because FMC thinks he might disclose its trade secrets. Like the North Carolina Court of Appeals, this Court agrees that "[a]n injunction [should] ... not be issued merely to allay the fears and apprehensions or to soothe the anxieties of a party. Nor will an injunction be issued to restrain one from doing that which he is not attempting to do." *See Travenol,* 30 N.C.App. at 696, 228 S.E.2d 478.

### CONCLUSION

FMC seeks an injunction that will prevent Fickling from performing any research and development in seven designated areas which comprise the bulk of the process whereby lithium products are manufactured. But other than showing that Fickling has gone to work for its competitor, FMC has not shown there is a threat of misappropriation. Nor has it shown any special circumstances that might justify such extraordinary injunctive relief. Similarly, FMC has not presented evidence of specific trade secrets and processes that are properly protected under its confidentiality agreement with Fickling or the North Carolina Trade Secrets Protection Act. Nor has FMC asked this Court for an injunction more narrowly tailored to protect those specific trade secrets. Because the injunction FMC seeks is very broad, because FMC has not produced evidence of the specific trade secrets it seeks to protect, and because FMC has merely shown a possibility of misappropriation, FMC's Motion for a Preliminary Injunction is denied.

**NOW, THEREFORE, IT IS ORDERED** that:

(1) Plaintiff's Motion for a Preliminary Injunction (document #1–2) be, and hereby is, *DENIED;* and

(2) the Temporary Restraining Order filed September 1, 1995 (document #7) be, and hereby is, *DISSOLVED.*