Velocity Solutions, Inc. v. BSG, LLC, 2015 NCBC 51.

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 557

VELOCITY SOLUTIONS, INC.;
INTELLIGENT LIMIT SYSTEM,
LLC; DEPOSIT SCORE, LLC; and
SHESHUNOFF MANAGEMENT
SERVICES, LP,

Plaintiffs,

v.

BSG, LLC d/b/a BSG FINANCIAL,
LLC and d/b/a BANK STRATEGY
GROUP; HOGHAUG CONSULTING,
LLC; and ERIK M. HOGHAUG,
individually,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ORDER

{1}     THIS MATTER is before the Court on Defendants' Joint Motion for Attorney Fees Pursuant to NCGS § 66-154(d) and Motion for Sanctions Pursuant to N.C. Rule of Civ. P. 11 ("Motion"), filed January 23, 2015.  For the reasons stated below, the Motion is DENIED.

*Murchison, Taylor & Gibson, PLLC by Andrew K. McVey for Plaintiffs.*

*Van Hoy, Reutlinger, Adams & Dunn by Stephen J. Dunn for Defendant BSG, LLC and Fisher & Phillips LLP by J. Michael Honeycutt for Defendants Hoghaug Consulting, LLC and Erik M. Hoghaug.*

Gale, Chief Judge.

## I.     NATURE OF MATTER BEFORE THE COURT

{2}     Plaintiffs brought claims, including for trade secret misappropriation, that they dismissed without prejudice.  Defendants contend that Plaintiffs never had a reasonable factual or legal basis upon which to pursue those claims and that

they were brought in bad faith and for an improper purpose. Defendants now seek the award of attorneys' fees under section 66-154(d) of the North Carolina General Statutes and Rule 11 of the North Carolina Rules of Civil Procedure ("Rule(s)").

## II.    PROCEDURAL AND FACTUAL HISTORY

{3}    Plaintiffs filed their initial Complaint on February 19, 2014. The parties jointly designated the matter as a complex business case on March 21, 2014, and the matter was assigned to the undersigned on March 26, 2014.

{4}    Plaintiffs' claims arise out of competition between Velocity Solutions, Inc. ("Velocity") and Defendant BSG, LLC ("BSG") in the sale of overdraft protection software. Defendant Erik M. Hoghaug ("Hoghaug") formerly worked for both Sheshunoff Management Services, L.P. ("SMS") and Velocity. Plaintiffs contend that he acquired intimate knowledge of Plaintiffs' "confidential and proprietary business practices and trade secrets," including "proprietary algorithms, client contact lists, product pricing, consulting and marketing methods, and software architecture upon which proprietary software and solutions are based." (Am. Compl. ¶ 20.) On September 2, 2008, Hoghaug entered into a confidentiality agreement with Velocity as a part of his employment.

{5}    Hoghaug left Velocity's employ during or before 2012, after which he formed Hoghaug Consulting, LLC ("HC"). Through HC, Hoghaug worked with BSG to modify and update BSG's software. Plaintiffs assert that BSG then enjoyed significant commercial success that necessarily resulted from Hoghaug's misappropriation of Plaintiffs' trade secrets and his breach of the confidentiality agreement.

{6}    Plaintiffs originally brought claims for breach of employment contract and misappropriation of trade secrets against Hoghaug; tortious interference with contract against BSG; tortious interference with customer contracts against Hoghaug, HC, and BSG; and unfair and deceptive trade practices against all Defendants.

{7}     BSG answered on April 11, 2014. Hoghaug and HC moved to dismiss the claims alleged against them on May 5, 2014. Their primary contention was that Plaintiffs had failed adequately to identify any trade secrets or misappropriation upon which they could proceed. Plaintiffs moved for leave to file an amended complaint on May 27, 2014, which Defendants opposed on grounds of futility.

{8}     The Court calendared the motion to dismiss for hearing on June 25, 2014, but the hearing was cancelled because no court reporter was available. The Court instead held an unrecorded, informal conference with the parties, during which the Court advised the parties that it was inclined to allow the motion to amend and defer further consideration of Defendants' arguments as to the adequacy of Plaintiffs' specification of trade secrets until after the amended complaint was filed. The Court also advised Plaintiffs that they would have to specify their trade secrets with greater detail before the Court would allow them to proceed with discovery.

{9}     Plaintiffs voluntarily dismissed their tortious interference claim against Hoghaug and HC on June 25, 2014, and filed an Amended Complaint on July 15, 2014, one purpose of which was to make more express Plaintiffs' reliance on the doctrine of inevitable disclosure.

{10}    On November 3, 2014, the Court approved a consent protective order, pursuant to which the Court understands the parties exchanged some information regarding Plaintiffs' alleged trade secrets. Defendants maintain that Plaintiffs never specified their trade secrets in the required manner.

{11}    Plaintiffs voluntarily dismissed the action without prejudice on December 23, 2014.

{12}    Defendants jointly moved for attorneys' fees on January 23, 2015. The parties have filed affidavits, documentary materials, and extensive briefs. The Court heard oral argument in New Hanover County on April 17, 2015. The Motion is ripe for ruling.

## III.   FINDINGS OF FACT

{13}   The Court makes the following findings of fact solely for purposes of ruling on the Motion.  Such findings shall not be deemed conclusive or "the law of the case" in this or subsequent proceedings.  Specifically, the Court does not assess the ultimate merits of Plaintiffs' claims, determining only whether they had adequate potential merit to withstand the imposition of sanctions.

### A.  The Parties

{14}   Plaintiff Velocity is a North Carolina corporation.  Plaintiff Intelligent Limit System, LLC ("ILS") is a North Carolina limited liability company that maintained rights in an overdraft software protection product known as Intelligent Limit System ("ILS Software").  Plaintiff Deposit Score, LLC ("Deposit Score") is a Delaware limited liability company that developed an overdraft software product known as Deposit Score ("SMS Software"), formerly sold by Plaintiff SMS, a Texas limited partnership.  SMS sold its overdraft software to Velocity in May 2012.

{15}   Defendant BSG is a Kentucky limited liability company with its principal office in Jefferson County, Kentucky.  BSG offers an overdraft management software known as Courtesy Connect or Courtesy Limit.

{16}   Defendant Hoghaug is an individual and resident of Hays County, Texas.  Hoghaug worked for SMS between 2002 and 2008, and then for Velocity from 2008 to 2012.  Following his employment with Velocity, in June 2012, Hoghaug formed HC, a Texas limited liability company with its principal office in Hays County, Texas.  Hoghaug consults with BSG through a July 2012 contract between BSG and HC.

### B.  Hoghaug Employment-Related Contracts

{17}   Hoghaug was intimately involved in SMS's design of the SMS Software which Velocity acquired from SMS in June 2012.

{18}   Hoghaug began work with Velocity around September 2008.  He signed an employment agreement that included an agreement not to disclose Velocity's

confidential information such as computer programs, pricing structures, price lists, and customer lists. (Leonard Aff. ¶¶ 12–14.) The agreement also included a restrictive covenant; however, that covenant does not prohibit competitive employment in the field of overdraft protection software of the nature at issue in this litigation. (Defs.' Joint Mot. Attorney Fees Pursuant to NCGS § 66-154(d) and Mot. Sanctions Pursuant to N.C. Rule of Civ. P. 11 ("Motion") Ex. A.)

{19}   Beginning in early 2012, Hoghaug took a leave of absence from Velocity. Just before his sabbatical commenced, Velocity requested and Hoghaug declined a new employment agreement that would include a restrictive covenant prohibiting competitive employment in the field of overdraft protection software. Hoghaug did not resume his employment with Velocity. Upon his return from sabbatical, Velocity requested but Hoghaug did not agree to enter into a new employment agreement.

{20}   Hoghaug was heavily involved in Velocity's development and subsequent 2009 launch of the ILS Software. Velocity has made an initial showing that Hoghaug was intimately familiar with the methods by which Velocity developed its dynamic scoring algorithms—the method by which its software allows a financial institution to dynamically assess a customer's qualifications for overdraft advances based on changing circumstances. Velocity has made an initial showing that Hoghaug was intimately familiar with Velocity's confidential customer base and pricing strategies, including, for example, his awareness that Velocity maintained certain formulas with minimum pricing that varied from customer to customer and that were not known publicly or even to Velocity's customers. (Leonard Aff. ¶¶ 31–32.) Velocity has also made an initial showing that BSG has secured customers at pricing just below these minimums of which BSG could have known only through Hoghaug's disclosures. (Leonard Aff. ¶ 25.)

{21}   Hoghaug was employed by Velocity when certain federal requirements for overdraft services ("Regulation E"), 12 C.F.R. § 205.17, were changed in early 2010 in a manner that prohibited a financial institution from affording overdraft advances without specific customer requests, or what has been referred to as

"opting in." Velocity's evidence demonstrates that it developed software programs and a method for marketing those programs to financial institutions that wish to adjust to the changes brought about by the amendments to Regulation E. (Triggiano Aff. ¶ 7; Leonard Aff. ¶¶ 7–8, 15–17.)

## C. Competition Between Velocity and BSG

{22}    Velocity, BSG, and, previously, SMS compete in selling overdraft management software for use by financial institutions. There are disputed facts as to the similarities and differences between their respective products. There are particular disputes as to whether BSG's software had the capability for dynamic overdraft limits comparable to Velocity's product prior to consulting with Hoghaug, and whether BSG developed such functionality without access to Velocity's confidential information through Hoghaug. Velocity asserts that its dynamic debit decline functionality is a hallmark feature and was uniquely functional. (King Aff. ¶ 33.) BSG has produced evidence that its product had at least some dynamic functionality before BSG ever consulted with Hoghaug, and that, in fact, Velocity was aware of this capability as a result of negotiations for the potential purchase of BSG's product several years ago. Velocity presented counter-evidence that BSG became more active in the marketplace, modified its product to increase its functionality, consistently underpriced Velocity, and achieved unusual success only after Hoghaug began consulting with BSG.

## D. Velocity's Claim of Trade Secrets Misappropriation

{23}    Defendants have consistently denied that Hoghaug has misappropriated any Velocity trade secrets, that Plaintiffs have ever specified particular information which qualifies as a protectable trade secret, or that Plaintiffs have ever alleged act facts, as opposed to speculation, that support any finding of misappropriation. They then conclude that these failures demonstrate that Velocity had no good faith basis to bring any claim for trade secret misappropriation.

{24}   Plaintiffs deny that their claims rest only on speculative inferences. Velocity has presented evidence that it made substantial and detailed inquiry. Affidavits of its litigation counsel and in-house counsel indicate that before bringing their claims, Plaintiffs conducted more than twenty interviews, reviewed publicly available information about BSG's product, conducted other documentary review, including customer communications, and vetted claims through counsel. (King Aff. ¶9; McVey Aff. ¶ 7; Pls.' Br. Opp'n Defs.' Mot. Attorneys' Fees and Sanctions ("Opp'n Br.") 17–18.)

{25}   Based on this investigation, Plaintiffs contend they formed a reasonable and good faith belief that: (1) Velocity's confidential information qualified for trade secret protection; (2) Hoghaug was in a position to and did in fact misappropriate this information; and (3) the Complaint and Amended Complaint were filed in good faith, whether or not the claims ultimately prevail.

{26}   Plaintiffs admit that their good faith belief substantially relies on inferences they draw from available facts that are necessarily limited because Plaintiffs have not had the opportunity to obtain discovery or review BSG's current product. They contend, however, that these inferences are not speculative, but are strong enough to rise, at a minimum, to the level of a good faith belief that their claim of trade secret misappropriation was well grounded in fact and supported by existing law.

{27}   Velocity asserts trade secret protection for four categories of information: pricing strategies, customer information, strategies for developing automatic communications by a financial institution with its clients, and the algorithm for scoring a client's overdraft limit qualification.

{28}   Defendants deny that any such information deserves trade secret protection, pointing out that (1) BSG's product had dynamic functionality before Hoghaug ever consulted with BSG; (2) the impact of changes to Regulation E and strategies for responding to those changes were well known and the subject of many public sources; (3) the customer base for the competitive software products is the banking industry, whose members are well known and freely available; and (4)

customers know their own pricing negotiations and history. While Defendants' denial of wrongdoing has been consistent and categorical, Defendants have not yet been subjected to discovery on the issue of whether they used information that they would have known about only through Hoghaug's consultation.

{29} The Court has carefully reviewed the briefs and affidavits and pressed Plaintiffs' counsel at oral argument for the evidence that they contend supports their claims. The Court summarizes that evidence as follows:

a. Hoghaug had access to the full range of Velocity's trade secrets during the time of his employment (Leonard Aff. ¶¶ 7–8);

b. Velocity takes substantial steps to guard the secrecy of that information (Triggiano Aff. ¶ 17);

c. On at least one occasion, Hoghaug attempted to use SMS confidential information on Velocity's behalf in violation of his confidentiality agreement with SMS, and as a result of which Velocity management intervened to preclude such use (Leonard ¶ 17);

d. Hoghaug left Velocity after being asked to sign a covenant against competition, without disclosing his intent to provide consulting services to BSG (Leonard Aff ¶ 18);

e. Hoghaug has admitted that he was making efforts to make BSG "smarter" (Leonard Aff. ¶ 21; *accord* Bekink Aff. ¶ 15);

f. There is a strong, consistent correlation between the pricing BSG offers to customers, its gains, and Velocity's losses. The correlation proves or strongly implies that Hoghaug revealed or used knowledge of Velocity's confidential pricing strategies to undercut Velocity. This undercutting is not likely accidental, as BSG's pricing is consistently 5 to 10 percent below the most-discounted ILS Software available to similar financial institutions (King Aff. ¶ 13);

g. Hoghaug has repeatedly approached Velocity customers, indicating that BSG can deliver a product with the same functionality at reduced cost (*see, e.g.*, Leonard Aff. ¶ 25);

h. Other improvements to BSG products occurring after Hoghaug began to work for BSG included additions to debit decline efficiency or opportunities, as evidenced by BSG modifying its website after working with Hoghaug to champion for the first time in advertisements that it had a debit decline feature. (McVey Supplemental Aff. Ex. A; *see also* Triggiano Aff. ¶ 16).

{30}    Defendants deny each of these factual assertions and contend that no good faith inference of trade secret misappropriation can be drawn from them.

### E.  Activities Outside Pleadings and Court Appearances

{31}    A Rule 11 inquiry is typically confined to the pleading, but Defendants claim that events after the Complaint was filed are relevant to demonstrate an improper purpose under Rule 11 and bad faith under section 66-154(d).  They contend that these developments demonstrate that Plaintiffs never had a good faith belief in their claims, but brought the action several months after Hoghaug first began working with BSG and for the bad faith and improper purpose of trying to derail BSG's competitive gains or to leverage BSG into selling its product to Velocity.

{32}    Defendants presented evidence that they advised Velocity's counsel in March 2014 that BSG's product had dynamic limits capabilities as early as 2009, proven by the fact that this functionality was included in the product BSG offered to Velocity for sale in 2009.  Velocity responded that its primary interest in 2009 was in a different product and the agreement in connection with the 2009 negotiations required Velocity to return or destroy information regarding those negotiations.  Consequently, Plaintiffs claim that by 2014 no one could remember any details of BSG's 2009 product.  Plaintiffs further contend that they have not been allowed to review BSG's current and prior software product through discovery.

{33}    Defendants emphasize that they have steadfastly and consistently denied any misappropriation or misuse of confidential information, and that they

have demanded proof to the contrary but have been given none. They assert that the factual allegations in the Complaint and Amended Complaint are simply false.

{34} Defendants have further offered evidence regarding negotiations beginning around September 2014, which Defendants contend demonstrate Plaintiffs' bad faith and improper purpose in bringing the litigation. On September 18, 2014, Velocity's President e-mailed BSG's principal, Mr. Barrett Nichols, to inquire whether the litigation might be best resolved by Velocity purchasing BSG's product. (Leonard Aff. ¶¶ 44–45; Mot. Ex. F.) On September 30, 2014, Defendants continued with their discovery efforts to force Velocity to state its trade secrets with greater specificity. On or about October 16, 2014, before discovery responses were due, Velocity proposed a process by which it would offer a limited statement of its trade secrets, followed by mediation, and full discovery responses only after discovery. (Mot. Ex. G.)[1] Velocity then produced a document that Defendants contend was limited to generalities and provided no significantly greater detail than the Amended Complaint as to what trade secrets were being claimed, and again included no information that was not generally known and freely available. (Mot. Ex. H.) Velocity responds that its offering was not intended as a full description of its trade secrets, but was intended to be adequate enough to place Defendants on notice as to areas which Plaintiffs intended to pursue and on which they would seek discovery.

{35} On November 19, 2014, Velocity informally requested that BSG produce information regarding its customers and revenues in anticipation of mediation. BSG did not provide that information, but on December 8, 2014, sent Velocity a packet of information that BSG contends demonstrates that the information Velocity claims is a trade secret is within the public domain. (*See* Mot.

---

[1] The Court understands that Plaintiffs withheld further specificity because the negotiated protective order did not include any "attorneys eyes only" provision and that any information Plaintiffs produced would have been available to Hoghaug, albeit subject to the limitations of the protective order. No motion to compel further discovery was ever presented to the Court before the action was dismissed.

Ex. J.)  Velocity also requested that it be allowed to depose Hoghaug before mediation, but Hoghaug did not agree.  (McVey Aff. ¶ 22.)

{36}  The parties held a mediation on December 12, 2014, but did not reach a settlement.

{37}  Negotiations continued after mediation.  A Velocity e-mail reflects its understanding that BSG did not believe there could be any fruitful negotiations while litigation was pending, after which Plaintiffs then dismissed their lawsuit without prejudice on December 23, 2014.  (Mot. Ex. K; *see also* Leonard Aff. ¶ 52; Triggiano Aff. ¶¶ 18–19.)  Velocity advised BSG on December 30, 2014, that it would reinstate the litigation if there were no meaningful negotiations concerning Velocity's purchase of BSG's software.  Velocity again pressed for progress on the negotiations on January 15, 2015.  (Defs.' Br. Supp. Joint Mot. Attorney Fees Pursuant to NCGS § 66-154(d) and Sanctions Pursuant to N.C. Rule of Civ P. 11 ("Supp. Br.") 11.)  In response, BSG demanded that the suit be dismissed with prejudice.  (McVey Aff. ¶ 27.)

{38}  BSG filed the current motion on January 23, 2015.

## IV.  LEGAL STANDARDS GOVERNING THE AWARD OF FEES

{39}  Defendants bring their Motion pursuant to Rule 11 and section 66-154(d).

### A.  Rule 11

{40}  Rule 11 provides, in pertinent part:

The signature of an attorney or party constitutes a certificate by him
that he has read the pleading, motion, or other paper; that to the best
of his knowledge, information, and belief formed after reasonable
inquiry it is well grounded in fact and is warranted by existing law or a
good faith argument for the extension, modification, or reversal of
existing law, and that it is not interposed for any improper purpose,
such as to harass or to cause unnecessary delay or needless increase in
the cost of litigation. . . . If a pleading, motion, or other paper is signed
in violation of this rule, the court, upon motion or its own initiative,
shall impose upon the person who signed it, a represented party, or
both, an appropriate sanction, which may include an order to pay to

the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

N.C. R. Civ. P. 11(a).

{41}    This Court and the North Carolina Court of Appeals have addressed the standards to be applied in determining whether fees should be awarded pursuant to Rule 11, and how Rule 11 varies from other statutory bases for awarding fees. *See generally McKinnon v. CV Indus.*, 745 S.E.2d 343 (N.C. Ct. App. 2012) (addressing motion for fees under Rule 11, N.C. Gen. Stat. § 6-21.5 (2014), and N.C. Gen. Stat. § 75-16.1 (2014)); *McKinnon v. CV Indus.*, 2013 NCBC LEXIS 51 (N.C Super. Ct. Nov. 26, 2013).  In summary, a Rule 11 inquiry has three prongs. Before awarding fees under Rule 11, the Court must find that a pleading (1) lacked factual sufficiency, (2) lacked legal sufficiency, or (3) was filed for an improper purpose. *Static Control Components, Inc. v. Vogler*, 152 N.C. App. 599, 603, 568 S.E.2d 305, 308 (2002) (quoting *Dodd v. Steele*,  114 N.C. App. 632, 635, 442 S.E.2d 363, 365 (1994)).  A Rule 11 violation may be grounded on a pleading's failure to comply with any of these three requirements.

{42}    The improper purpose prong of a Rule 11 inquiry is separate from the inquiry as to factual or legal sufficiency. *Bryson v. Sullivan*, 330 N.C. 644, 663, 412 S.E.2d 327, 337 (1992).  The question is whether the pleading was made for a purpose other than to vindicate the pleader's rights. *Ward v. Jett Props., LLC*, 191 N.C. App. 605, 609, 663 S.E.2d 862, 865 (2008).  Whether a pleading was filed for an improper purpose is to be measured objectively. *Id.*

{43}  The factual and legal sufficiency prongs of the Rule 11 inquiry are separate but tend to merge into the inquiry of whether the pleader made a reasonable factual inquiry and legal analysis adequate to form the belief that the pleading was "well grounded in fact and [was] warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." N.C. R. Civ. P. 11(a).  "An inquiry is reasonable if 'given the knowledge and information which can be imputed to a party, a reasonable person under the same or similar

circumstances would have terminated his or her inquiry and formed the belief that the claim was warranted under existing law.'" *Static Control Components, Inc.*, 152 N.C. App. at 604, 568 S.E.2d at 308 (quoting *Bryson*, 330 N.C. at 661–62, 412 S.E.2d at 336). The Rule 11 inquiry must be based on the pleading in question and the reasonableness of the belief that it is warranted by existing law should be judged at the time the document was signed. *Bryson*, 330 N.C. at 656, 412 S.E.2d at 333. The Court does not look beyond to responsive pleadings but makes its inquiry on the basis of the pleading on which the motion is based. *Id.* As to legal sufficiency, a court looks first to whether the pleading is facially plausible, and proceeds to a reasonableness inquiry only if there is no facial plausibility. *McKinnon*, 745 S.E.2d at 347.

## B. Section 66-154(d)

{44} Section 66-154(d) provides, in pertinent part, "If a claim of misappropriation is made in bad faith or if willful and malicious misappropriation exists, the court may award reasonable attorneys' fees to the prevailing party." N.C. Gen. Stat. § 66-154(d) (2014). Assuming the movant is a "prevailing party,"[2] the inquiry is whether the claim of misappropriation was made in bad faith or with malice.

{45} The North Carolina Trade Secrets Act does not define "bad faith" as the term is used in section 66-154(d). As a result, Defendants contend that this Court should look to decisions of other states that have adopted a two-part standard to resolve claims based on statutes modeled on the Uniform Trade Secrets Act, as North Carolina's act is. Under this two-part inquiry, a court looks at (1) "objective speciousness"; and (2) "subjective bad faith." *See Hill v. Best Med. Int'l, Inc.*, Nos. 07-01709 and 09-1194, 2011 U.S. Dist. LEXIS 147853, *10 (W.D. Pa. Dec. 22, 2011); *Berry v. Haw. Express Serv.*, Civ. No. 03-00385 SOM/LEK, 2007 U.S. Dist. LEXIS 15077, *42–46 (D. Haw. Mar. 2, 2007); *Degussa Admixtures, Inc. v. Burnett*, 471 F.

---

[2] Because it denies the Motion on other grounds, the Court need not determine whether a dismissal without prejudice could qualify Defendants as a "prevailing party." .

Supp. 2d 848, 857 (W.D. Mich. 2007); *Contract Materials Processing v. Kataleuna GmbH Catalysts*, 222 F. Supp. 2d 733, 744 (D. Md. 2002); *Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 1262 (2002); . Plaintiffs argue that the Court need not look to authority outside of North Carolina because there is adequate North Carolina appellate precedent to guide the Court's determination.

{46} Our appellate courts have not yet written extensively on standards to be applied to determine bad faith under section 66-154(d), but the North Carolina Court of Appeals has stated succinctly that a finding of bad faith does not follow simply because a claimant proceeded with legal malice so long as the claimant had "a good faith belief that the suit has legitimate basis." *Reichhold Chems., Inc. v. Goel*, 146 N.C. App. 137, 158, 555 S.E.2d 281, 294 (2001). This holding followed the court's determination that the complaint was not "utterly baseless" and was "objectively reasonable" for purposes of section 75-1.1. *Id.* at 157, 555 S.E.2d at 293. The Court has also noted that statutory standard for awarding attorneys' fees under section 66-154(d) is separate and distinct from the standard for awarding fees under section 6-21, and that no award can be made under section 66-154(d) without the requisite finding of bad faith or willful and malicious misappropriation. *Bruning & Federle Mfg. Co. v. Mills*, 185 N.C. App. 153, 155–57, 647 S.E.2d 672, 674–75 (2007).

{47} There is no indication that our appellate courts would require a determination of subjective bad faith in contrast to the objective standard of Rule 11. However, as discussed below, in this particular case, the Court concludes that the outcome would not differ, and Plaintiffs should not be sanctioned irrespective of whether the Court followed an objective or a subjective standard.

## V.    ANALYSIS

{48} A Rule 11 inquiry, at least as to factual and legal sufficiency, is limited to the circumstances as they existed at the time the pleading in question was filed, whereas the section 66-154(d) inquiry is  temporally broader and may extend

beyond the pleadings.  However, the inquiries under the two rules are similar, and Defendants' presentation beyond the pleadings regarding the negotiations appears aimed at both the improper purpose prong of a Rule 11 inquiry as well as the section 66-154(d) standard.

{49}    An essential tenet of Defendants' argument is that Plaintiffs never pleaded and never had a basis to plead with specificity that they had information qualifying for trade secret protection.  They do not claim they were unfairly subjected to discovery.  There are different standards that may determine first whether a trade secrets claim should withstand a Rule 12(b)(6) motion, and second, whether a trade secrets claimant is entitled to proceed with discovery.  Those different standards are evident from various decisions in this Court.  Judge Bledsoe thoroughly addressed these standards in his two well-reasoned decisions in *DSM Dyneema, LLC v. Thagard,* 2014 NCBC 51 *17–21 (N.C. Super. Ct. Oct. 17, 2014) (addressing necessary specification to permit discovery) and *DSM Dyneema, LLC v. Thagard*, 2015 NCBC LEXIS 50, *10–13 (N.C. Super. Ct. May 12, 2015) (addressing necessary specification required to state an initial claim to withstand dismissal under Rule 12(b)(6)).  The Court cannot improve on Judge Bledsoe's exposition, and there is no reason that his discussion needs to be repeated here.  The undersigned, without the same in-depth discussion, reached a similar conclusion when addressing a Rule 12(c) motion in *Le Bleu Corp. v. B. Kelley Enterprises, Inc.,* 2014 NCBC LEXIS 66 (N.C. Super Ct. Dec. 9, 2014).  Judge McGuire utilized a consistent approach when addressing discovery in *Southern Fastening Systems, Inc. v. Duo-Fast Carolinas, Inc.,* No. 14 CVS 8372 (N.C. Super. Ct. Feb. 9, 2015), *available at* http://www.ncbusinesscourt.net/TCDDotNetPublic/default.aspx?CID=3&caseNumber=14CVS8372.

{50}    Each of those decisions is based on a line of appellate precedents dealing with the specificity required for pleading trade secrets, including *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 510–11, 606 S.E.2d 359, 364 (2004), upon which Defendants heavily rely in arguing the Motion.  This Court has also recognized that the requirement of specificity extends beyond identifying trade secrets to also

require specificity as to the acts by which misappropriation was accomplished. *Veer Right Mgmt. Grp., Inc. v. Czarnowski Display Servs.*, 2015 NCBC LEXIS 13, *15 (N.C. Super. Ct. Feb. 4, 2015).

{51}    Here, the issue of specificity does not arise under Rule 12 or Rule 26, but is presented in the context of a motion for sanctions. As such, the Court believes there is a third standard that requires an inquiry as to whether the pleading was, when filed, devoid of factual or legal sufficiency or was brought or maintained in bad faith for an improper purpose. A failure to comply with Rule 12 does not necessarily equate to a violation of Rule 11 or a transgression sanctionable under section 66-154(d).

{52}    After substantial consideration of the record, arguments, briefing, and review of authorities, the Court concludes that (1) Plaintiffs had an adequate factual and legal basis to form a reasonable, good faith belief in the merits of their claim; (2) Plaintiffs brought those claims in a legitimate effort to seek relief; and (3) such reasonable and good faith belief is adequate to preclude the imposition of sanctions, including attorneys' fees under either Rule 11 or section 66-154(d). Again, the Court did not and was not required to determine that the claims are adequate to withstand Rule 12 or that Plaintiffs have made a sufficient showing to justify discovery.

{53}    In reaching its conclusion, the Court has considered the arguments of counsel as to how Plaintiffs may have attempted to use the doctrine of inevitable disclosure. It is uncertain whether the North Carolina appellate courts will adopt the doctrine, and if so, under what limitations. This Court has expressed its own reservation as to how and if the doctrine should be applied. *Allegis Grp., Inc. v. Zachary Piper LLC*, 2013 NCBC LEXIS 12, *27–29 (N.C. Super. Ct. Feb. 25, 2013). One federal district court applying North Carolina law has predicted that North Carolina's appellate courts will follow the doctrine, while another declined to apply it. *Compare Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1459 (M.D.N.C. 1996), *with FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F. Supp. 1477, 1482 (W.D.N.C. 1995)

{54}    The Court believes that the parties' briefing and argument addresses the doctrine a bit out of context.  The doctrine is generally used to enjoin a former employee from working with a competitor to prevent inevitable future misappropriation because it would be impossible for the employee to refrain from disclosing the former employer's trade secrets in such employment.  It is not generally thought of as a basis for proof of actual misappropriation after the fact.  Here, the case was not filed until several months after Hoghaug had been consulting with BSG.  Plaintiffs did not bring their request for injunctive relief forward for hearing.  In this case, the argument is whether there are inferences that are strong enough to support a good faith belief that BSG could not have made its product modifications or achieved its competitive successes but for Hoghaug's actual misappropriation of Velocity's protected information.

{55}    While it need not express any opinion on whether Plaintiffs will ultimately be able to withstand Rule 12 in any refiled action, and if so, whether they are able to develop adequate evidentiary proof of their claims, the Court concludes the investigation outlined in paragraph 24, *supra*, was reasonable, and that, based on this investigation, Plaintiffs had a good faith belief that their claims were well grounded in fact and were warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.  Further, Plaintiffs instituted and maintained the litigation in good faith for the purpose of pursuing relief that they perceived to be legitimate, and have not proceeded in bad faith or for an improper purpose.

{56}    Stated conversely, Defendants have the burden to prove to the Court that it should impose sanctions under either Rule 11 or section 66-154(d), and they have not met their burden.

{57}    As stated, the Court's conclusion is the same whether it is required to apply an objective or a subjective standard to determine bad faith or improper purpose.  As a result, the Court need not further consider whether the North Carolina courts should adopt standards employed by other jurisdictions for

purposes of determining bad faith in actions governed by statutes modeled on the Uniform Trade Secrets Act.

## VI.    CONCLUSION

{58}    Accordingly:

1. The Court shall not award sanctions, including attorneys' fees, under Rule 11;

2. The Court shall not award sanctions, including attorneys' fees, under section 66-154(d);

3. Defendants' Motion is DENIED.


IT IS SO ORDERED this 26th day of May, 2015.


      /s/ James L. Gale

James L. Gale

Chief Special Superior Court Judge

  for Complex Business Cases